2013 UT App 290

**STATE of Utah, Plaintiff and Appellee,**

v.

**Samuel Joseph HOFFMANN, Defendant and Appellant.**

**No. 20111039–CA.**

Court of Appeals of Utah.

Dec. 12, 2013.

Samuel P. Newton, Attorney for Appellant.

Brian L. Tarbet and Jeffrey S. Gray, Salt Lake City, Attorneys for Appellee.

Judge J. FREDERIC VOROS JR. authored this Opinion, in which Judges CAROLYN B. McHUGH and STEPHEN L. ROTH concurred.

## Opinion

VOROS, Judge:

¶ 1 Samuel Joseph Hoffmann appeals from a district court order denying his motion to suppress drugs, drug paraphernalia, and a handgun seized during a warrant search of his apartment. We affirm.

## BACKGROUND [1]

¶ 2 This case began, like many others, with an informant's tip. The informant told police about drug sales "in exchange for a possible reduction of his or her own charges." The informant reported that two males, "Sam" and "Rocky," distributed high-grade marijuana from their apartment. According to the informant, Sam and Rocky usually had "between 4 and 5 pounds of 'chronic'" in their apartment at any given time. The informant led officers to the apartment where the informant believed Sam and Rocky lived. The informant told the officers that they had a better chance of getting somebody to open the door if they covered the peephole, because the apartment's occupants usually looked out the peephole when someone knocked at the door. The informant also stated that the occupants would open the door only if they recognized the person outside.

¶ 3 When the Weber Morgan Narcotics Strike Force arrived at the apartment, Officer Jared Francom detected the faint smell of burnt marijuana "coming from what [he] believed to be inside the apartment." Officer Francom knocked and, following the informant's advice, covered the peephole with his finger "to try and prevent [the occupants from] seeing it was law enforcement at the door." Someone inside the apartment asked, "Who is it?" and demanded that whoever was

---

1. "We recite the facts in the light most favorable to the [district] court's findings from the suppression hearing." *State v. Despain,* 2007 UT App 367, ¶ 1 n. 1, 173 P.3d 213 (citation and internal quotation marks omitted).

knocking uncover the peephole. The officers did not respond. Officer Francom then heard the sound of a security-latch chain being secured.

¶ 4 Over the next few minutes Officer Francom knocked several more times. The occupants later characterized the knocks as unusually forceful: aggressive knocking lasting two or three minutes. One of the occupants, Reyes "Rocky" Cimina, finally opened the door, turned around, walked back into the apartment, and "sat down next to two other males on the couch without saying a word," leaving the door open behind him. With the door open, Officer Francom confirmed that the smell of burnt marijuana was coming from inside the apartment. In fact, he was "overwhelmed by the odor of burnt marijuana coming from inside."

¶ 5 Officer Francom asked, "Can I come in?" In response, one of the men on the couch said, "Yeah, come in." When the officers entered the apartment, they asked the three men on the couch if they lived there. Hoffmann, who was standing just out of sight in the kitchen, answered that he did. Hoffmann also gave the officers his name. When Officer Francom asked for permission to search the apartment for drugs and paraphernalia, Hoffmann asked if he had a search warrant. Officer Francom said that he did not but that he "could obtain one if that was the way [Hoffmann] wanted to proceed." Hoffmann told Officer Francom that he wanted to speak to an attorney. Officer Francom "took that to mean that [Hoffmann] was not going to authorize consent." The officers proceeded to secure the premises by searching and handcuffing the four occupants and conducting a protective sweep of the apartment. During the sweep, they found a bong in a bedroom.

¶ 6 Officer Francom left to obtain a search warrant. While drafting his affidavit, he received a call from the officers still at Hoffmann's apartment reporting that two potential buyers had arrived at the apartment. Officer Francom had previously investigated the first buyer in a case "involving a lot of ecstasy tablets"; the second buyer was carrying $700 in cash. Officer Francom also "did a check of Mr. Hoffmann's background"

and "learned that there was a [previous] complaint made regarding ... the odor of marijuana coming from [Hoffmann's] apartment." Officers had tried to investigate at that time by knocking at the apartment door, but no one had answered. Officer Francom's search warrant affidavit included information about the bong, Hoffmann's statement that he lived in the apartment, the two potential buyers, and the prior marijuana complaint. When Officer Francom returned with a warrant, the officers searched the apartment and found five bags of marijuana, several items of drug paraphernalia, and a handgun.

¶ 7 Hoffmann was charged with possession of a controlled substance with the intent to distribute and possession of a firearm by a restricted person. See Utah Code § 58–37–8(1)(a)(iii) (LexisNexis Supp.2010); id. § 76–10–503(3) (2008). Hoffmann moved to suppress the evidence the officers obtained during the initial warrantless entry and during the later warrant search.

¶ 8 The district court denied the motion. The court agreed with Hoffmann that the officers entered his apartment without lawful consent. But it ruled that the evidence obtained before entry supplied probable cause to support a warrant. The court explained that it had adopted the method Hoffmann's attorney recommended: it deleted from the search warrant affidavit all references to evidence found after the entry, including the "discussions with the people that were there, all of the observations that were made there, the bong, [and] everything else that was the result of the warrantless [search]." The court then "looked at what was left and ... was of the opinion that [it] would have issued that search warrant." It pointed to three pieces of information it believed justified the issuance of a search warrant: (1) the faint odor of marijuana the officers detected before the door opened, (2) the overwhelming odor of burnt marijuana emanating from the apartment after the door opened, and (3) the tip provided by the informant, corroborated in part by Officer Francom's "testing" of the tip by using the peephole-covering maneuver the informant had recommended.

¶ 9 Following the district court's denial of his motion to suppress, Hoffmann entered a

conditional no-contest plea to the two charges, reserving his right to appeal the court's suppression decision. Hoffmann now appeals the order denying his motion to suppress.

## ISSUES AND STANDARDS OF REVIEW

■ ¶ 10 Hoffmann first contends that by covering the apartment door peephole, the officers employed "trickery and deception, which negates voluntary consent to open a door to police." "Whether consent was given presents a question of fact reviewed for clear error; whether consent was voluntary presents a question of law reviewed for correctness." *State v. Gomez*, 2012 UT App 102, ¶ 6, 275 P.3d 1073.

■ ¶ 11 Hoffmann next contends that the officers would not have sought a warrant—and the magistrate would not have granted one—without the evidence discovered after the warrantless entry. Therefore, in Hoffmann's view, any information gathered during the warrant search must be suppressed. The district court's denial of the motion to suppress is a legal determination, reviewed for correctness. *See State v. Brake*, 2004 UT 95, ¶¶ 11–15, 103 P.3d 699.

¶ 12 Finally, Hoffmann contends that the district court should have excluded all the challenged evidence as a remedy for a violation of the Utah Constitution, which, he asserts, does not recognize the independent-source doctrine. This contention presents a question of law. *See Chen v. Stewart*, 2004 UT 82, ¶ 25, 100 P.3d 1177.

## ANALYSIS

¶ 13 The challenged evidence was obtained in a search conducted pursuant to a warrant. Relying on the Fourth Amendment to the United States Constitution and article I, section 14 of the Utah Constitution, Hoffmann maintains that the warrant search was unlawful for two reasons. First, he argues that the search warrant affidavit was based on evidence obtained through an unlawful warrantless search, that is, by tricking the apartment occupants into opening their door. Second, he argues that the warrant search should be suppressed because, but for evidence acquired in the warrantless entry (including the opening of the door), the officers would not have sought a warrant and the magistrate would not have issued one.

### I. The Warrantless Entry

¶ 14 The district court ruled that the eventual warrant search of Hoffmann's apartment was supported by probable cause. The probable cause finding rested on three key pieces of evidence, all obtained without a warrant: (1) the confidential informant's tip, (2) the faint odor of marijuana Officer Francom detected before the door to Hoffmann's apartment opened, and (3) the overwhelming odor of burnt marijuana emanating from the apartment after the door opened.

¶ 15 Hoffmann maintains that the third piece of evidence should not have been included in the probable cause calculus, because it was obtained unlawfully. In Hoffmann's view, by covering the peephole and knocking loudly but intermittently for several minutes Officer Francom coerced the occupants into opening the front door. We conclude that Officer Francom did not coerce the occupants into opening the apartment door. He thus acted lawfully in perceiving the overwhelming smell of burnt marijuana and in including that fact in the search warrant affidavit.

### A. The Occupants' Consent to Open the Door

¶ 16 Hoffmann contends that by covering the apartment door peephole, the officers employed "trickery and deception, which negates voluntary consent to open a door to police." To guard against deception, he proposes a rule that "officers seeking to engage people in the home or observe the home's interior" be required to "identify themselves *as police* so as to allow those inside to decide whether to expose themselves and the residence to police." Because the officers at his door did not disclose their identity, Hoffmann reasons, all evidence they obtained after the door opened—including the overwhelming odor of burnt marijuana—should have been suppressed.

¶ 17 The State denies that the officers used any inherently coercive tactics. It argues that the occupants' decision to open the door was "an essentially free and unconstrained choice." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) (discussing voluntariness in the context of confessions). Thus, in the State's view, the overwhelming odor of burnt marijuana was properly included in the warrant affidavit.

¶ 18 "The Fourth Amendment generally prohibits the warrantless entry of a person's home.... The prohibition does not apply, however, to situations in which voluntary consent has been obtained...." *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990) (citations omitted). "Consent is not voluntary if it is obtained as 'the product of duress or coercion, express or implied.'" *State v. Bisner*, 2001 UT 99, ¶ 47, 37 P.3d 1073 (quoting *Schneckloth*, 412 U.S. at 227, 93 S.Ct. 2041).

¶ 19 Police commonly act in ways that lead suspects to believe they are not in fact police. This tactic alone does not require suppression of information obtained from suspects. *See, e.g., Hoffa v. United States*, 385 U.S. 293, 300–02, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966) (holding "no interest legitimately protected by the Fourth Amendment [was] involved" when the government successfully placed a police informant in Hoffa's inner circle); *United States v. Alejandro*, 368 F.3d 130, 131–32, 137–38 (2d Cir.2004) (holding that officers who posed as utility workers to gain entry committed no constitutional violation); *United States v. Allen*, 675 F.2d 1373, 1377, 1382 (9th Cir.1980) (holding that a customs official who posed as a representative of the Bureau of Land Management did not violate the fourth amendment); *United States v. Raines*, 536 F.2d 796, 798–800 (8th Cir.1976) (holding that a law enforcement agent who posed as a friend of the defendant's drug associate "did not interfere with the defendant's Fourth Amendment rights"). "[T]he particular circumstances of each case govern the admissibility of evidence obtained by stratagem or deception." *Lewis v. United States*, 385 U.S. 206, 208, 87 S.Ct. 424, 17 L.Ed.2d 312 (1966). But "it has long been acknowledged by the decisions of [the United States Supreme Court] that, in the detection of many types of crime, the Government is entitled to use decoys and to conceal the identity of its agents." *Id.* at 208–09, 87 S.Ct. 424 (citations omitted).

¶ 20 Here, the officers engaged in no deception. They made no misrepresentations. In fact, they made no representations at all. Hoffmann testified that the officers knocked loudly for several minutes, that Rocky went to the door and told Hoffmann that someone was covering the peephole, and that he told Rocky not to open the door. But nothing in the testimony of the apartment occupants indicates that the officers misidentified themselves or that they misrepresented the purpose of their visit.

¶ 21 Indeed, the occupants of the apartment were well aware that whoever was knocking insistently on their door was concealing his or her identity. They knew the person on the other side might well be a police officer. They did not know that person's identity, and they knew that they did not know it—it was a *known unknown*. *See Republic of Iraq v. Beaty*, 556 U.S. 848, 860, 129 S.Ct. 2183, 173 L.Ed.2d 1193 (2009) (quoting *Pieces of Intelligence: The Existential Poetry of Donald H. Rumsfeld* 2 (Hart Seely ed., 2003)). The occupants knew they were not just opening the door to a stranger; they were opening the door to someone deliberately trying to hide his or her identity. Despite that knowledge, one of the occupants opened the door.

¶ 22 Because the officers made no misrepresentations, their peephole-covering tactic was not only noncoercive, it was more innocuous than the disguises and decoys that government actors have long constitutionally employed. *See Lewis*, 385 U.S. at 208–09, 87 S.Ct. 424. As the United States Supreme Court noted in *Lewis v. United States*, a requirement that officers identify themselves would "severely hamper the Government in ferreting out those organized criminal activities that are characterized by covert dealings with victims who either cannot or do not protest." *Id.* at 210, 87 S.Ct. 424. Therefore, we hold that the officers' covering of the

peephole did not render the occupants' consent to open the door involuntary.

¶ 23 This conclusion accords with that reached by the United States Court of Appeals for the Eleventh Circuit in a recent peephole-covering knock-and-talk case:

> [W]hen officers covered [the defendant's] peephole, they did not vitiate the voluntary nature of the encounter. The measure of impermissible conduct is coercion. Here, there was no evidence that officers overpowered [the defendant's] will by using force, threats, misrepresentations, or blandishments to coax him into opening the door. By covering the peephole, they merely limited the information upon which [the defendant] acted—his decision to open the door, however, remained unfettered and uncoerced.

*United States v. Hall,* 500 Fed.Appx. 819, 821 (11th Cir.2012) (per curiam) (citation omitted).

¶ 24 In sum, when the officers covered Hoffmann's peephole they did not coerce the occupants or misrepresent the nature of their investigation. Rocky Cimina's decision to open the door was thus "an essentially free and unconstrained choice." *See Schneckloth v. Bustamonte,* 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Once he opened the door, the overwhelming odor of burnt marijuana was plainly observable. Therefore, the officers lawfully observed it.

### B. Government Searches Under *Jardines*

¶ 25 Our conclusion is not affected by *Florida v. Jardines,* a United States Supreme Court decision issued after briefing was complete in this case. In *Jardines,* the Court, in a five-to-four decision, held that officers' use of a drug-sniffing dog on the defendant's front porch constituted a trespass and therefore an unlawful search under the Fourth Amendment. —— U.S. ——, 133 S.Ct. 1409, 1416–17, 185 L.Ed.2d 495 (2013).

¶ 26 The facts in *Jardines* are unlike those before us. In *Jardines,* officers led a drug-sniffing dog to the defendant's front door. *Id.* at 1413. The dog alerted, and the officers obtained a warrant. *Id.* In the warrant search of the home, they found marijuana plants. *Id.*

¶ 27 The intrusive nature of the dog-sniff was central to the *Jardines* holding. The majority opinion relied on what it termed "the traditional property-based understanding of the Fourth Amendment." *Id.* at 1417. The Court stated, "At the [Fourth] Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable government intrusion.'" *Id.* at 1414 (quoting *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). The right to retreat and be free of government intrusion "would be of little practical value if ... agents could stand in a home's porch or side garden and trawl for evidence with impunity ... [or] enter a man's property to observe his repose from just outside the front window." *Id.* Unlike the accepted practice of knocking on another's door, "[t]here is no customary invitation" to employ a drug-sniffing dog on another's front porch. *Id.* at 1416. But the dog sniff was not just a breach of decorum, it was an "investigation," *id.* at 1415, an "attempt to gather information," *id.,* and a tactic employed "in hopes of discovering incriminating evidence," *id.* at 1416.

¶ 28 Two other members of the *Jardines* majority joined Justice Kagan in a separate concurrence. In their view, drug-sniffing dogs, like thermal-imaging cameras, are "super-sensitive instrument[s], ... deployed to detect things inside that [police] could not perceive unassisted," and therefore their use constitutes not only "a trespass," but also "an invasion of privacy." *Id.* at 1418–19 (Kagan, J., concurring) (citing *Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001)).

¶ 29 Four Justices dissented. Justice Alito's dissenting opinion criticized the majority for deeming the dog sniff a trespass: "If bringing a tracking dog to the front door of a home constituted a trespass, one would expect at least one case to have arisen during the past 800 years. But the Court has found none." *Id.* at 1424 (Alito, J., dissenting). The dissent also rejected the analogy between dog sniffs and thermal-imaging tech-

nology on the ground that a drug-sniffing dog "is not a new form of 'technology' or a 'device.'" *Id.* at 1425.

¶ 30 In contrast to the facts of *Jardines*, covering an apartment peephole is neither a trespass nor an investigation. *See id.* at 1415. It gives the officers no information about what is going on inside the home. As the Eleventh Circuit Court of Appeals reasoned, "By covering the peephole, [officers] merely limited the information upon which [the defendant] acted...." *United States v. Hall*, 500 Fed.Appx. 819, 821 (11th Cir.2012) (per curiam). Consequently, a covered peephole does not threaten the right the *Jardines* majority sought to protect—"the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *See* 133 S.Ct. at 1414 (citation and internal quotation marks omitted). *But cf. State v. Campbell*, 297 Kan. 273, 300 P.3d 72, 78–79 (2013) (applying *Jardines* and concluding that an officer who covered a peephole "exceed[ed] the scope of a knock and talk" and "engaged in conduct that violated the Fourth Amendment").

¶ 31 *Jardines* therefore does not change our conclusion that the apartment's occupants made "an essentially free and unconstrained choice" when they opened the door to the officers. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Because the district court properly ruled that the officers lawfully observed the overwhelming odor of burnt marijuana wafting out the open door, we analyze Hoffmann's remaining contentions in light of this ruling.

## II. The Warrant Search

¶ 32 Hoffmann next contends that because the warrant was a product of the officers' unlawful entry into the apartment, the dis-

trict court should have excluded the evidence obtained pursuant to that warrant. In Hoffmann's view, the tainted evidence affected the officers' decision to seek the warrant and the magistrate's decision to issue it. Accordingly, Hoffmann argues, the district court erred when it relied on the independent-source exception found in *Murray v. United States* to deny his motion to suppress the evidence seized pursuant to the warrant. 487 U.S. 533, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

¶ 33 The State responds that Hoffmann "did not preserve his claim that the officers were prompted to obtain a warrant by what they discovered" after their warrantless entry. The State adds that even with the tainted evidence removed from the warrant affidavit, "the remaining untainted evidence ... was sufficient to establish probable cause." Therefore, the State argues, the tainted evidence did not affect the magistrate's decision to issue a warrant.[2]

■■■ ¶ 34 "The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search...." *Murray*, 487 U.S. at 536, 108 S.Ct. 2529. "[T]he exclusionary rule also prohibits the introduction of derivative evidence ... that is the product of the primary evidence, or that is otherwise acquired as an indirect result of the unlawful search...." *Id.* at 536–37, 108 S.Ct. 2529. However, derivative evidence remains admissible when its "connection with the unlawful search becomes so attenuated as to dissipate the taint." *Id.* at 537, 108 S.Ct. 2529 (citation and internal quotation marks omitted); *see also Wong Sun v. United States*, 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

---

**2.** The State also urges us to reject the district court's ruling that the officers' initial entry into Hoffmann's apartment was unlawful. If the officers' initial entry was legal, the State argues, Hoffmann can point to no unlawful search and therefore can make no argument for exclusion. *See Murray v. United States*, 487 U.S. 533, 536–37, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

Specifically, the State argues that an officer's warrantless entry into a home may be legal even without the consent of the homeowner if "the

police reasonably, but mistakenly, believe that a third party consenting to a search has the authority to do so." *State v. Harding*, 2011 UT 78, ¶ 12, 282 P.3d 31 (citing *Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). Because we conclude that the district court properly denied Hoffmann's motion to suppress under *Murray v. United States*, we need not consider whether the officers' initial entry was unlawful.

¶ 35 The independent-source doctrine is an exception to the exclusionary rule. *See Nix v. Williams,* 467 U.S. 431, 443–44, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *accord State v. Krukowski,* 2004 UT 94, ¶ 7, 100 P.3d 1222. When officers conduct two searches, the first unlawful and the second lawful, evidence seized during the second search is admissible if the second search "is genuinely independent of [the] earlier, tainted one." *Murray,* 487 U.S. at 542, 108 S.Ct. 2529. The independent-source doctrine seeks to "put[ ] the police in the same ... position ... they would have been in if no police error or misconduct had occurred." *Nix,* 467 U.S. at 443, 104 S.Ct. 2501. Taken together, the exclusionary rule and the independent-source doctrine seek to balance "the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime." *See id.*

¶ 36 *Murray* provides a two-pronged test for determining whether two searches are "genuinely independent." 487 U.S. at 542, 108 S.Ct. 2529. The government must establish (1) that the officers' decision to seek a warrant was not "prompted by what they had seen during the initial entry" and (2) that no information gained from the illegal entry "was presented to the Magistrate and affected his decision to issue the warrant." *Id.*

¶ 37 Our supreme court recognized and applied the two-pronged *Murray* test in *State v. Krukowski,* 2004 UT 94, 100 P.3d 1222. In *Krukowski,* the defendant argued that *Murray* "require[s] an officer to inform a magistrate of [a] prior illegal entry" to convince the magistrate "that whatever was found during that initial illegal entry was not used to establish probable cause." *Id.* ¶ 8 (alterations in original). The court rejected that argument and reaffirmed the traditional formulation of the *Murray* test: "Under *Murray,* a warrant-based seizure that follows an unlawful entry is not subject to the exclusionary rule if the State establishes that neither the officer's decision to seek the warrant nor the magistrate's probable cause determination was prompted by observations made during the unlawful entry." *Id.* ¶ 7.

## A. The Officers' Decision to Seek a Warrant

¶ 38 *Murray*'s first prong requires a showing that the officers' decision to seek a warrant was not prompted by what they saw during the unlawful search. Hoffmann argues that the State failed to make this showing. The State responds that Hoffmann did not preserve the issue.

¶ 39 To preserve an issue for appeal, a party must present it "to the trial court in such a way that the trial court has an opportunity to rule on that issue." *438 Main St. v. Easy Heat, Inc.,* 2004 UT 72, ¶ 51, 99 P.3d 801 (citation and internal quotation marks omitted). To fulfill that requirement, "(1) the issue must be raised in a timely fashion[,] (2) the issue must be specifically raised[,] and (3) the challenging party must introduce supporting evidence or relevant legal authority." *Id.* (alterations in original) (citation and internal quotation marks omitted).

¶ 40 Here, Hoffmann's discussion of *Murray*'s first prong consisted of a single line in his memorandum supporting his motion to suppress: "In Mr. Hoffmann's case, agents may have been prompted by what they saw inside the home...." By stating that the officers "may have been prompted by what they saw," Hoffmann also implied the converse—that the officers may *not* have been. This equivocation suggests that Hoffmann was not asserting a violation of *Murray*'s first prong. *Cf. State v. Winfield,* 2006 UT 4, ¶ 15, 128 P.3d 1171 (explaining the invited error doctrine). Perhaps because Hoffmann did not squarely challenge the State's showing on the first *Murray* prong, the district court made no express finding on it. In any event, we need not decide the preservation question, because we conclude that, as Hoffmann's equivocal statement to the district court implied, *Murray*'s first prong is satisfied here.

¶ 41 When a party presents a factual issue to the trial court but the court makes no findings of fact on the issue, "we assume that the trier of facts found them in accord with its decision." *State v. Ramirez,* 817 P.2d 774, 787–88 (Utah 1991) (citation and

internal quotation marks omitted). "We affirm the decision if from the evidence it would be reasonable to find facts to support it." *Id.* (citation and internal quotation marks omitted). The district court considered *Murray*'s application of the independent-source doctrine in denying Hoffmann's motion to suppress. The doctrine was briefed and argued by both parties, and the court made specific findings regarding the second *Murray* prong. *See infra* Part II. B. Because the district court ruled that the *Murray* test was satisfied, we assume it found that the officers' decision to seek a warrant was not motivated by evidence they discovered during their initial search.

¶ 42 The record facts support that finding. Before the officers entered Hoffmann's apartment, they had already received an informant's tip, partially tested the tip by covering Hoffmann's peephole, detected the faint smell of marijuana with the door closed, and noted that the smell intensified when the door opened. As explained below, the smell of burnt marijuana alone may provide probable cause to obtain a warrant. *See infra* Part II.B. Even if the officers had not entered the apartment—and therefore neither found the bong nor confirmed that someone named "Sam" lived there—they had probable cause to support a warrant as a matter of law. In fact, before the officers discovered the bong during the protective sweep, Officer

Francom told Hoffmann that he would be able to obtain a warrant based on the evidence the officers had already gathered. The officers' decision to seek a warrant thus did not depend on additional supporting evidence. Because the evidence supports the finding that the officers were not prompted to seek a warrant by what they saw after their initial entry, we affirm the district court's ruling denying Hoffmann's suppression motion insofar as it rests on *Murray*'s first prong.[3]

### B. The Magistrate's Decision to Issue the Warrant

¶ 43 Hoffmann next argues that *Murray* requires the State to demonstrate that "illegally obtained evidence submitted to the magistrate did not affect the magistrate's decision" to grant a warrant. The State responds that the untainted information in the search warrant affidavit "was more than sufficient to establish probable cause" and therefore the tainted evidence "did not materially affect the magistrate's decision to issue the warrant."

¶ 44 The second prong of *Murray* has two parts. It asks first whether unlawfully obtained information was presented to the magistrate. *Murray v. United States,* 487 U.S. 533, 542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). The State does not dispute that

---

3. We note that the fact that the officers collected more evidence after an illegal entry does not end the analysis—indeed, if this fact were dispositive it would defeat the independent-source doctrine in every case. *See United States v. Herrold,* 962 F.2d 1131, 1141–42 (3d Cir.1992) ("[T]he fact that an application for a warrant contains information obtained through an unlawful entry does not *per force* indicate that the improper information 'affected' the justice's decision to issue the warrant and thereby vitiate the applicability of the independent source doctrine.").

Although *Murray* allowed admission of evidence collected after an illegal entry, it rejected the idea that the test it established would foster a " 'search first, warrant later' mentality." *Murray v. United States,* 487 U.S. 533, 540 n. 2, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988). Though the independent-source doctrine permits the introduction of evidence that would otherwise be suppressed by the exclusionary rule, it does not provide an incentive for "law enforcement officers [to] routinely enter without a warrant to make sure that

what they expect to be on the premises is in fact there." *Id.* at 539, 108 S.Ct. 2529. Because the "burden of convincing a trial court" of *Murray*'s two prongs exceeds "the normal burden of convincing a magistrate that there is probable cause," officers still have a clear incentive to seek a warrant before entering. *Id.* at 540, 108 S.Ct. 2529.

*Murray* does not excuse calculating officers seeking to subvert the warrant requirement. Rather, *Murray* recognizes that the exclusionary rule is unlikely to deter unlawful police conduct when agents simply "misjudged the existence of sufficient exigent circumstances to justify the warrantless entry"—or, as in this case, when the officers may have misjudged the existence of consent to enter the apartment. *See id.* at 540 n. 2, 108 S.Ct. 2529; *see also United States v. Leon,* 468 U.S. 897, 918–21, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). Here, as in *Murray,* nothing suggests that the officers entered "merely to see if there was anything worth getting a warrant for." *See Murray,* 487 U.S. at 540 n. 2, 108 S.Ct. 2529.

tainted information was contained in Officer Francom's affidavit and presented to the magistrate. For example, Officer Francom included in his affidavit the discovery of the bong and his conversation with Hoffmann. He also included two other pieces of evidence that the district court later excluded in its *Murray* analysis: a prior complaint about marijuana smoke coming from Hoffmann's apartment, and the fact that several potential buyers arrived at Hoffmann's apartment after Officer Francom left to obtain the warrant.[4]

¶ 45 The second part of *Murray*'s second prong asks whether the unlawfully obtained information affected the magistrate's decision to issue a warrant. *Id.* "Every circuit to consider the question has held that the Court's instruction in *Murray* to analyze whether the tainted information affected the magistrate's decision to issue the warrant did not mean to change the dominant pre-existing approach" established by *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). *See United States v. Dessesaure*, 429 F.3d 359, 366–67 (1st Cir.2005) (collecting cases).

¶ 46 Under *Franks*, a court faced with a tainted affidavit must weigh the probable cause decision "with the affidavit's false material set to one side." 438 U.S. at 156, 98 S.Ct. 2674. If "the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Id.; see also State v. Krukowski*, 2004 UT 94, ¶ 14, 100 P.3d 1222.

¶ 47 The district court here followed those instructions precisely. It "went through the search warrant," "deleted all the ... evidence based on the illegal entry," "then looked at what was left and ... was of the opinion that [it] would have issued that search warrant" even if the disputed evidence had not been included. Hoffmann argues that an informant's tip and the faint smell of marijuana outside a closed door are not sufficient to establish probable cause. However, the district court—properly, in our view—relied not just on those two items of evidence but also on the overwhelming odor of burnt marijuana wafting out when the door was opened. *See supra* Part I. We analyze the point in that light.

¶ 48 Utah case law holds that when a trained officer who is lawfully present detects "the plain smell of marijuana emanating from a private residence, [that discovery] provides law enforcement officials with probable cause to conduct a search of the premises." *State v. South*, 885 P.2d 795, 799 (Utah Ct.App.1994), *rev'd on other grounds*, 924 P.2d 354 (Utah 1996); *see also State v. Duran*, 2005 UT App 409, ¶ 22, 131 P.3d 246 ("[T]he smell of burning marijuana provided ... officers probable cause that a crime was being committed."), *aff'd*, 2007 UT 23, 156 P.3d 795.[5]

¶ 49 Officer Francom had training and experience in detecting marijuana. He was lawfully on Hoffmann's doorstep when he first detected the odor of marijuana. *See supra* Part I. And with the door open, the odor was plain—overwhelming, in fact. Under Utah law, the plain smell of marijuana detected by a trained officer who is lawfully present provides probable cause sufficient to support a warrant.[6] *South*, 885 P.2d at 799.

---

4. The bong and Officer Francom's conversation with Hoffmann are more closely related to the officers' entry than are the discovery of the prior complaint and the arrival of potential buyers. But the State does not challenge the district court's decision to strike "all mention of evidence obtained as a direct result of the initial illegal search." Accordingly, we likewise exclude the prior complaint and the potential buyers from the probable cause analysis.

5. However, the smell of burnt marijuana does not, without more, provide the exigent circumstances justifying a warrantless search. "The

aroma of burning marijuana must be accompanied by some evidence that the suspects are disposing of the evidence, as opposed to casually consuming it, before law enforcement officials may be lawfully justified in claiming the benefits of the exigent circumstances exception" to the warrant requirement. *State v. Duran*, 2007 UT 23, ¶ 8, 156 P.3d 795.

6. In support of his argument that the smell of marijuana alone cannot establish probable cause, Hoffmann cites *People v. Taylor*, a 1997 Michigan Supreme Court vehicle-search case that concluded that courts should be "more cautious when

In addition, other evidence also contributed to a finding of probable cause—the informant's tip, corroborated in part by the peephole exercise. We therefore conclude that the issuing judge had a substantial basis for ruling that probable cause existed, and we affirm the district court's determination that the search warrant was properly issued.

¶ 50 The district court properly ruled that the tainted evidence did not affect the officers' decision to seek the warrant or the magistrate's decision to issue it. We therefore hold that the trial court correctly applied the independent-source doctrine and affirm its denial of Hoffmann's motion to suppress on that ground.

### III.   The Utah Constitution

¶ 51 Finally, Hoffmann contends that article I, section 14 of the Utah Constitution provides a separate basis for excluding the evidence discovered in the warrant search. He asserts that the Utah Constitution does not recognize the independent-source doctrine. The State responds that Hoffmann failed to preserve the state constitutional claim in the district court and failed to adequately brief it on appeal. The State also maintains that an exclusionary rule itself is not a feature of article I, section 14. *See State v. Walker,* 2011 UT 53, ¶¶ 27–61, 267 P.3d 210 (Lee, J., concurring).

¶ 52 The standard for briefing a state constitutional claim is admittedly flexible. Our supreme court has "reject[ed] the ... suggestion ... that there is a formula of some kind for adequate framing and briefing of state constitutional issues before district courts and [the supreme] court." *State v. Tiedemann,* 2007 UT 49, ¶ 37, 162 P.3d 1106.[7] "Independent analysis must begin with the constitutional text and rely on whatever assistance legitimate sources may provide in the interpretive process." *Id.* These may include " 'historical and textual evidence, sister state law, and policy arguments in the form of economic and sociological materials to assist us in arriving at a proper interpretation of the provision in question.' " *Id.* (quoting *State v. Gardner,* 947 P.2d 630, 633 (Utah 1997)); *see also Society of Separationists v. Whitehead,* 870 P.2d 916, 921 n. 6 (Utah 1993). "Historical arguments may be persuasive in some cases, but they do not represent a *sine qua non* in constitutional analysis." *Tiedemann,* 2007 UT 49, ¶ 37, 162 P.3d 1106.[8]

¶ 53 Finally, while "[a]rguments based ... on historical context, the constitution's text, public policy, or persuasive authority would all meet [our] briefing requirements" for state constitutional arguments, *State v. Worwood,* 2007 UT 47, ¶ 18, 164 P.3d 397, "state constitutional analysis ... limited to the truism that article I, section 14 may provide greater protections to Utah citizens

basing probable cause on smell" and "use smell as one factor in a totality of circumstances [analysis]." 454 Mich. 580, 564 N.W.2d 24, 30 (1997). But the Michigan Supreme Court has since overruled *Taylor* and brought Michigan's law in line with our own. *See People v. Kazmierczak,* 461 Mich. 411, 605 N.W.2d 667, 668 (2000) ("[W]e overrule *Taylor,* and hold that the smell of marijuana alone by a person qualified to know the odor may establish probable cause to search a motor vehicle, pursuant to the motor vehicle exception to the warrant requirement.").

7.   We read this sentence as including the court of appeals as well as the supreme court and district courts.

8.   This statement contrasts with the interpretive model described in *American Bush v. City of South Salt Lake,* 2006 UT 40, 140 P.3d 1235, issued the year before *Tiedemann.* There, a majority of our supreme court stated that "in inter-

preting the Utah Constitution, prior case law guides us to analyze its text, historical evidence of the state of the law *when it was drafted,* and Utah's particular *traditions at the time of drafting.*" *Id.* ¶ 12 (emphases added). "The goal of this analysis," the court stated, "is to discern the intent and purpose of both the drafters of our constitution and, more importantly, the citizens who voted it into effect." *Id.* Accordingly, the court "intentionally excluded the consideration of policy arguments." *Id.* ¶ 12 n. 3.

At least one justice of our supreme court has resisted the court's apparent retreat from the interpretive approach discussed in *American Bush.* Justice Lee has urged the court to "categorically repudiate our precedents ... that treat the original meaning of the law as merely one of several 'persuasive' grounds for judicial construction and that open the door to any 'sister state law' or good 'policy' that we deem relevant." *State v. Walker,* 2011 UT 53, ¶ 32 n. 9, 267 P.3d 210 (Lee, J., concurring).

than the Fourth Amendment" fails to advance an adequate state constitutional analysis, *id.* ¶ 19.

¶ 54 Whatever the precise briefing standard, Hoffmann's brief falls short. It does not quote or analyze the constitutional text, which our supreme court has consistently held to be the starting point of state constitutional analysis. It does not discuss the original understanding of article I, section 14. And it does not discuss historical and textual evidence, sister state law, or policy arguments.

¶ 55 Hoffmann's state constitutional argument is composed largely of citations to cases, many of which interpret the Fourth Amendment, for broad generalities of search and seizure law. For example, citing *State v. Larocco,* 794 P.2d 460, 464 (Utah 1990) (plurality opinion), he asserts that article I, section 14 "has been applied to require police to stay within the traditional justification for the exceptions to the warrant requirement or otherwise seek a warrant *before* they search." Hoffmann also cites a Utah case applying *Larocco, see State v. Yount,* 2008 UT App 102, ¶¶ 23–24, 182 P.3d 405, and two Utah cases interpreting article I, section 14 in the context of police roadblocks, *see Sims v. State Tax Comm'n,* 841 P.2d 6, 13–15 (Utah 1992); *State v. DeBooy,* 2000 UT 32, ¶ 19, 996 P.2d 546. The remaining cases cited by Hoffmann interpret the Fourth Amendment, not the Utah Constitution. *See Murray v. United States,* 487 U.S. 533, 537, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988); *Payton v. New York,* 445 U.S. 573, 576, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980); *Terry v. Ohio,* 392 U.S. 1, 8, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Wong Sun v. United States,* 371 U.S. 471, 477–78, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *State v. Harris,* 671 P.2d 175, 179–80 (Utah 1983); *State v. Kent,* 20 Utah 2d 1, 432 P.2d 64, 66–67 (1967).

¶ 56 Of course, a litigant advocating a novel application of a state constitutional provision cannot be expected to cite controlling law. But here Hoffmann urges us to read article I, section 14 to bar an independent-source exception to the exclusionary rule without analyzing either the rationale for the independent-source doctrine or the question of whether article I, section 14 includes an exclusionary rule. This latter point is significant. "The issue of whether the Utah Constitution contemplates an exclusionary rule is a controversial one." *State v. Walker,* 2011 UT 53, ¶ 25, 267 P.3d 210 (Nehring, J., joined by Durham and Parrish, JJ., concurring). As noted, one justice of our supreme court has already made his position clear: "there is no exclusionary rule under the Utah Constitution." *Id.* ¶ 28 (Lee, J., concurring).

¶ 57 Given the complexity of the issues involved, adequate briefing requires more than repeating such truisms as that "warrantless searches will be permitted only where they satisfy their traditional justification, namely, to protect the safety of police or the public or to prevent the destruction of evidence," *Larocco,* 794 P.2d at 469–70. This "analysis of the issue is so lacking as to shift the burden of research and argument to the reviewing court." *See State v. Thomas,* 961 P.2d 299, 305 (Utah 1998). Accordingly, Hoffmann has not carried his burden on appeal of demonstrating that the district court erred by not suppressing the challenged evidence under the Utah Constitution.

## CONCLUSION

¶ 58 When the officers covered Hoffmann's peephole during a knock-and-talk visit, they did not coerce the apartment's occupants to open the door. Because the occupants voluntarily opened the door, the district court properly refused to suppress the evidence of the overwhelming odor of burnt marijuana that wafted out the open door.

¶ 59 That overwhelming odor of burnt marijuana supports the magistrate's probable cause determination. The district court correctly concluded that neither the officers' decision to seek a warrant nor the magistrate's decision to issue a warrant were motivated by tainted evidence. The district court appropriately refused to exclude the evidence obtained using that warrant. We therefore affirm the district court's denial of Hoffmann's motion to suppress.