2015 UT App 192

## THE UTAH COURT OF APPEALS

WASATCH COUNTY,
Plaintiff, Appellant, and Cross-appellee,

*v.*

E. RAY OKELBERRY, BRIAN OKELBERRY, ERIC OKELBERRY,
AND WEST DANIELS LAND ASSOCIATION,
Defendants, Appellees, and Cross-appellants.

Opinion
No. 20140397-CA
Filed August 6, 2015

Fourth District Court, Heber Department
The Honorable Donald J. Eyre Jr.
No. 010500388

Scott H. Sweat and Craig N. Chambers, Attorneys
for Appellant

Don R. Petersen and Leslie W. Slaugh, Attorneys
for Appellees

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN and KATE A. TOOMEY
concurred.

VOROS, Judge:

¶1    This is the fourth appeal arising from a fourteen-year dispute over whether certain country roads in Wasatch County were dedicated to the public. During the course of this litigation, the Utah Legislature amended the controlling statute. This appeal asks whether that amendment controls this dispute. We hold that it does and thus that all the roads in question were dedicated to public use.

BACKGROUND

¶2    E. Ray Okelberry, Brian Okelberry, Eric Okelberry, and West Daniels Land Association (collectively, the Okelberrys) are owners of tracts of land located in Wasatch County (the Property). The Property consists of mountainous terrain with interconnecting dirt roads providing ingress and egress. The public used these roads—Circle Springs Road, Maple Canyon Road, Parker Canyon Road, Ridge Line Road, and Thornton Hollow Road—from the late 1950s, when the Okelberrys originally purchased the land, until the late 1980s. In the late 1980s or early 1990s, the Okelberrys began selling "trespass permits" to hunters. Later, in the early or mid-1990s, the Okelberrys placed the Property in a Cooperative Wildlife Management Unit to be used exclusively for private hunting. To enforce the trespass permits, the Okelberrys began closing and locking the gates at the road entrances to the Property.

¶3    In 2001, Wasatch County sued the Okelberrys to enforce the public's use rights over the roads under section 72-5-104 of the Utah Code (the Dedication Statute). After a bench trial in June 2004, the trial court concluded that the Okelberrys had dedicated some, but not all, of the roads to the public under the Dedication Statute. The court further ruled that Wasatch County had lost the ability to enforce the public's use under the doctrine of equitable estoppel. Wasatch County appealed the trial court's determination. We upheld the dedication finding but reversed the equitable-estoppel finding. *Wasatch County v. Okelberry* (*Okelberry I*), 2006 UT App 473, ¶ 33, 153 P.3d 745, *rev'd*, 2008 UT 10, 179 P.3d 768. On certiorari, our supreme court articulated a different standard for the conduct necessary to disrupt public use under the statute. *See Wasatch County v. Okelberry* (*Okelberry II*), 2008 UT 10, ¶ 15, 179 P.3d 768. The supreme court reversed our decision in *Okelberry I* and remanded the case to the trial court with instructions to make findings of fact consistent with the new standard. *Id.* ¶ 19.

¶4     On remand, the trial court applied the new standard and concluded that the Okelberrys had dedicated the roads to the public. The Okelberrys appealed, and we held that the Okelberrys must be permitted to present additional evidence of any intent to disrupt the road dedication and to allow the trial court to make findings of fact as to whether, when, and why the Okelberrys locked the gates. *Wasatch County v. Okelberry* (*Okelberry III*), 2010 UT App 13, ¶ 20, 226 P.3d 737.

¶5     In 2011, the Utah Legislature amended the Dedication Statute. *See* Utah Code Ann. § 72-5-104 (LexisNexis Supp. 2011).

¶6     In November 2012 and February 2013, the Okelberrys presented additional evidence to the trial court of their intent to interrupt the public's continuous use of the roads. In its "Findings of Fact and Conclusions of Law" dated January 14, 2014, the trial court concluded that the amended version of the Dedication Statute did not apply to this case. And it concluded that, under the standard announced in *Okelberry II*, the Okelberrys had dedicated some, but not all, of the roads to public use. But the court also made a conditional finding that if the amended Dedication Statute applied, all the roads would be dedicated to public use.

¶7     Wasatch County appeals, and the Okelberrys cross-appeal.


ISSUES ON APPEAL

¶8     The parties raise three issues on appeal. First, Wasatch County contends that the trial court erred in failing to apply the amended version of the Dedication Statute to this case. Wasatch County further contends that under the amended version of the Dedication Statute the Okelberrys dedicated all of the roads at issue to the public.

¶9    Second, Wasatch County contends that even if the amended version of the Dedication Statute does not apply, the trial court's findings of fact were insufficient under the standard set forth in *Okelberry II* to support its conclusion that the Okelberrys dedicated only some of the roads to public use.

¶10    Third, on cross-appeal the Okelberrys contend that the trial court erred in failing to recognize that "maintaining locked gates constitutes an overt act that interrupts public use."

ANALYSIS

I. Retroactivity

¶11    Wasatch County first contends that the trial court erred in ruling that the Okelberrys dedicated some, but not all, of the roads to public use. Wasatch County argues that this error resulted from the court's refusal to apply the amended version of the Dedication Statute. The Okelberrys respond that applying the amended version would contravene Utah law on retroactivity and violate the mandate rule. "We review for correctness questions regarding the law applicable in a case, including the issue of whether a given law can or should be applied retroactively." *Goebel v. Salt Lake City S. R.R., Co.*, 2004 UT 80, ¶ 36, 104 P.3d 1185.

¶12    The pre-2011 version of the Dedication Statute contained no intent requirement:

> A highway is dedicated and abandoned to the use
> of the public when it has been continuously used
> as a public thoroughfare for a period of ten years.

Utah Code Ann. § 72-5-104(1) (LexisNexis 2009).

¶13    However, in interpreting the pre-2011 version of the Dedication Statute in *Okelberry II*, our supreme court explained

that a property owner's act would interrupt continuous public use so long as it was "intended" and "reasonably calculated" to do so:

> An overt act that is intended by a property owner to interrupt the use of a road as a public thoroughfare, and is reasonably calculated to do so, constitutes an interruption sufficient to restart the running of the required ten-year period under the Dedication Statute.

2008 UT 10, ¶ 15, 179 P.3d 768. Significantly, under the court's interpretation of the statute, an overt act intended and reasonably calculated to interrupt the public's continuous use could legally interrupt the public's use even if it did not actually do so.

¶14    In defining "continuous use," the 2011 amendments to the Dedication Statute rejected the supreme court's emphasis on whether an act was "intended" or "reasonably calculated" to interrupt public use and required that such an act "actually" interrupt public use:

> Continuous use as a public thoroughfare . . . is interrupted only when the regularly established pattern and frequency of public use for the given road has actually been interrupted to a degree that reasonably puts the traveling public on notice . . . .

Utah Code Ann. § 72-5-104(3)(a) (LexisNexis Supp. 2011). The 2011 amendment also added a retroactivity provision:

> The provisions of this section apply to any claim under this section for which a court of competent jurisdiction has not issued a final unappealable judgment or order.

The Legislature finds that the application of this section:

(i) does not enlarge, eliminate, or destroy vested rights; and

(ii) clarifies legislative intent in light of Utah Supreme Court rulings in *Wasatch County v. Okelberry*, 179 P.3d 768 (Utah 2008), *Town of Leeds v. Prisbrey*, 179 P.3d 757 (Utah 2008), and *Utah County v. Butler*, 179 P.3d 775 (Utah 2008).

Utah Code Ann. § 72-5-104(9).

¶15 The trial court here ruled that, although the amended version of the Dedication Statute seemed to satisfy all the criteria for retroactive application, to apply it here would implicate substantive property rights:

However, since the statute affects substantive property rights and cannot be applied retroactively, the [c]ourt cannot apply this standard to determine if the roads have been dedicated to the public use.

Considering itself bound by the test announced in *Okelberry II*, the trial court asked not whether the acts of the property owners had actually interrupted public use, but whether those acts had been intended and reasonably calculated to do so. Applying this test, the trial court determined that some roads and portions of roads had been dedicated and some had not.

¶16 However, the court added that if the amended version of the statute applied—that is, if it were to consider whether the Okelberrys' actions actually interrupted public use rather than merely being intended and reasonably calculated to do so—it would reach a different conclusion: in light of "significant testimony from Wasatch County witnesses that they were not on

notice that the roads were not public roads as they never encountered any interruption, . . . the roads would be dedicated to the public use."

A.     Exceptions to the Retroactivity Prohibition

¶17    The legislature has declared, "A provision of the Utah Code is not retroactive, unless the provision is expressly declared to be retroactive." Utah Code Ann. § 68-3-3 (LexisNexis 2011). Accordingly, "[t]he courts of this state operate under a statutory bar against the retroactive application of newly codified laws." *State v. Clark*, 2011 UT 23, ¶ 11, 251 P.3d 829. The general prohibition against retroactive application, however, admits of two exceptions. First, an amendment applies retroactively if "the provision is expressly declared to be retroactive." Utah Code Ann. § 68-3-3. Second, "a narrow, judge-made exception to the retroactivity ban" allows that "when the purpose of an amendment is to clarify the meaning of an earlier enactment, the amendment may be applied retroactively in pending actions." *Clark*, 2011 UT 23, ¶ 11 (citation and internal quotation marks omitted); *see also State v. Johnson*, 2012 UT 68, ¶ 16, 290 P.3d 21. "This second exception applies to those narrow circumstances in which the state legislature disagrees with this court's interpretation of a law and attempts to clarify that law's meaning through the amendment process. In such circumstances, we apply the law as amended to pending actions." *Clark*, 2011 UT 23, ¶ 11 n.6. "Absent . . . these exceptions, the retroactivity ban holds, and courts must apply the law in effect at the time of the occurrence regulated by that law." *Id.* ¶ 11 (citation and internal quotation marks omitted).

¶18    Both exceptions apply here. First, the legislature expressly declared that the amended version of the Dedication Statute applies to non-final cases:

> The provisions of this section apply to any claim under this section for which a court of competent

jurisdiction has not issued a final unappealable judgment or order.

Utah Code Ann. § 72-5-104(9)(a) (LexisNexis Supp. 2011). "A judgment, to be final, must dispose of the case as to all the parties, and finally dispose of the subject-matter of the litigation on the merits of the case." *Shurtz v. Thorley*, 61 P.2d 1262, 1264 (Utah 1936); *see also Anderson v. Wilshire Invs., LLC*, 2005 UT 59, ¶ 9, 123 P.3d 393. At the time of the trial court's ruling, no court had issued a "final unappealable judgment or order."

¶19    Second, the express purpose of the amendment was "to clarify the meaning of an earlier enactment," *see Clark*, 2011 UT 23, ¶ 11 (citation and internal quotation marks omitted), where the legislature apparently "disagree[d] with [the Utah Supreme Court's] interpretation" of the unamended statute, *see id.* ¶ 11 n.6. Indeed, the text of the amendment cites the very cases whose interpretation of the statute the legislature apparently rejected:

> The Legislature finds that the application of this section:
>
> > (i) does not enlarge, eliminate, or destroy vested rights; and
> >
> > (ii) clarifies legislative intent in light of Utah Supreme Court rulings in *Wasatch County v. Okelberry*, 179 P.3d 768 (Utah 2008), *Town of Leeds v. Prisbrey*, 179 P.3d 757 (Utah 2008), and *Utah County v. Butler*, 179 P.3d 775 (Utah 2008).

Utah Code Ann. § 72-5-104(9)(b).

¶20    The trial court acknowledged that the "new statute specifically states that . . . the purpose of the amendment is to clarify previous legislative intent." But the court invoked the

distinction between substantive and procedural rights. "[S]ubstantive rights and liabilities are determined by the law in place at the time when a cause of action arises, and not [by] a subsequently enacted statute." *Clark*, 2011 UT 23, ¶ 12 (second alteration in original) (citation and internal quotation marks omitted). "[P]rocedural statutes enacted subsequent to the initiation of a suit, on the other hand, . . . appl[y] not only to future actions, but also to accrued and pending actions . . . ." *Id.* (citation and internal quotation marks omitted). Concluding that "because this case deals with substantive property rights," the trial court determined that the amended version of the Dedication Statute did not apply retroactively.

¶21   First, we note that the amendment itself declares that it "does not enlarge, eliminate, or destroy vested rights" but merely "clarifies legislative intent." *See* Utah Code Ann. § 72-5-104(9)(b)(ii). We understand these statements in context to mean that the amended version of the statute simply clarifies how the statute should have been understood from the beginning. And we see no reason why this should not be the case. The original version of the statute spoke of continuous use. *Id.* § 72-5-104(1) (LexisNexis 2009). *Okelberry II* held that continuous use could be legally interrupted by an act merely intended and reasonably calculated to do so. 2008 UT 10, ¶ 15, 179 P.3d 768. Then in 2011, the legislature clarified that when it said "continuously used" in the original version of the Dedication Statute it meant actually continuously used—that is, use that had not been "actually . . . interrupted." Utah Code Ann. § 72-5-104(3)(a) (LexisNexis Supp. 2011).

¶22   Relying principally on a 1977 case from the Louisiana Court of Appeal, the Okelberrys argue that to apply the statute to this pending case would be unconstitutional. *See Vaughn v. Williams*, 345 So. 2d 1195 (La. Ct. App. 1977). Specifically, they argue that to do so would violate due process, constitute a taking without just compensation, *see* Utah Const. art. I, § 7, enforce an ex post facto law, and impair the obligation of

contracts, *see id.* § 18. "When addressing a constitutional challenge to a statute, we presume that the statute is valid and resolve any reasonable doubts in favor of constitutionality." *State v. Willis*, 2004 UT 93, ¶ 4, 100 P.3d 1218.

¶23 The Okelberrys do not support their constitutional theories with pertinent legal authority and analysis beyond the text—or in some cases only the name—of the provisions on which they rely. Our supreme court has rejected the proposition "'that there is a formula of some kind for adequate framing and briefing of state constitutional issues before district courts and [appellate] court[s].'" *State v. Hoffmann*, 2013 UT App 290, ¶ 52 & n.7, 318 P.3d 225 (quoting *State v. Tiedemann*, 2007 UT 49, ¶ 37, 162 P.3d 1106). However, "[i]ndependent analysis must begin with the constitutional text and rely on whatever assistance legitimate sources may provide in the interpretive process." *Tiedemann*, 2007 UT 49, ¶ 37. Sources may include "historical and textual evidence, sister state law, and policy arguments in the form of economic and historical materials to assist us in arriving at a proper interpretation of the provision in question." *Society of Separationists v. Whitehead*, 870 P.2d 916, 921 n.6 (Utah 1993).

¶24 The Okelberrys have not provided this level of analysis. But we understand the crux of their argument—and the ruling of the trial court—that to apply the amended version of the Dedication Statute would deny them a substantive property interest by changing the rules of the game after the final buzzer has sounded.

¶25 We do not believe this case presents that scenario. The Okelberrys are correct that, as a general rule, "we apply the law as it exists at the time of the event regulated by the law in question." *State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829. Thus, "the general rule against retroactivity protects . . . reliance interests." *State v. Perez*, 2015 UT 13, ¶ 14, 345 P.3d 1150. "When we conclude that there has been justifiable reliance on the prior state of the law or that the retroactive operation of the new law

may otherwise create an undue burden, the court may order that a decision apply only prospectively." *Van Dyke v. Chappell*, 818 P.2d 1023, 1025 (Utah 1991) (referring to a change in the common law).

¶26    We begin the analysis, then, by considering the events regulated by the law in question. Here, the events regulated by the Dedication Statute—the public's use of the roads and the Okelberrys' interruption of that use—occurred not later than "1989 or the early 1990s." But the test on which the Okelberrys rely—that continuous use may be interrupted by an overt act "intended" and "reasonably calculated" to do so—did not appear in the law as it existed at that time; that formulation's pedigree extends no further back than a 2008 opinion of our supreme court. *See Okelberry II*, 2008 UT 10, ¶ 15, 179 P.3d 768. That test governed interpretation of the statute for a three-year window—2008 to 2011—well after the events regulated by the statute. Accordingly, the Okelberrys can have placed no reliance on *Okelberry II* with respect to the roads at issue in this case.

¶27    The Okelberrys do not contend that they would prevail under pre-2008 law. In any event, as explained above, our examination of the 2011 amendment leads us to agree with the legislature that, though lengthy, the 2011 amendment served largely to reaffirm, not alter, the statute's original meaning.

¶28    Accordingly, we cannot agree that adhering to the legislature's explicit directive to apply the statutory amendment to active cases will unsettle any party's justifiable reliance on the prior state of the law or impair vested property rights.

B.    The Mandate Rule

¶29    The Okelberrys resist the conclusion that the amended version of the Dedication Statute applies in this case in part on the ground that its application would violate the mandate rule. They argue that "[t]he amendments to [the Dedication Statute] purport to change the result in a pending case. Such an

assumption of a core judicial function violates the separation of powers doctrine inherent in the Utah Constitution."

¶30    Under the law-of-the-case doctrine, "a decision made on an issue during one stage of a case is binding on successive stages of the same litigation." *IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 26, 196 P.3d 588 (citation and internal quotation marks omitted). And "a district court's power to reconsider decided issues is limited when the case has been appealed and remanded." *Mid-America Pipeline Co. v. Four-Four, Inc.*, 2009 UT 43, ¶ 13, 216 P.3d 352. "This aspect of [the] law of the case doctrine is frequently referred to as the mandate rule." *Id*. Under the mandate rule, "issues resolved by [an appellate court] bind the trial court on remand, and generally bind this court should the case return on appeal after remand." *Gildea v. Guardian Title Co. of Utah*, 2001 UT 75, ¶ 9, 31 P.3d 543. "Thus, the decisions of an appellate court become the law of the case and cannot be reconsidered on remand." *Mid-America Pipeline Co.*, 2009 UT 43, ¶ 13.

¶31    However, the mandate rule is subject to an exception "when there has been an intervening change of controlling authority." *Gildea*, 2001 UT 75, ¶ 9 (citation and internal quotation marks omitted). The Okelberrys argue that this exception does not apply, because "the appellate decisions in this case limited the scope of inquiry on remand to whether [the] Okelberrys had performed an overt act to block use of the roads" to defeat the public dedication. "The trial court"—they argue—"did not, therefore, have authority to conduct a wide-ranging inquiry, but was required to focus solely on the issues framed by this Court."

¶32    "[T]he lower court must implement both the letter and the spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Utah Dep't of Transp. v. Ivers*, 2009 UT 56, ¶ 12, 218 P.3d 583 (alteration in original) (citation and internal quotation marks omitted). "The application

of the mandate rule lacks the flexibility found in other branches of the law of the case doctrine." *Thurston v. Box Elder County*, 892 P.2d 1034, 1038 (Utah 1995). "The [trial] court may not reopen the case to consider other issues or matters not included in the mandate." *Johnson v. State*, 235 S.W.3d 872, 875 (Ark. 2006). Thus, "[w]hen an appeals court vacates a judgment with narrowing instructions which direct the district court to consider certain issues, the district court does not have a mandate to reconsider other issues except in extraordinary circumstances." *United States v. Lynn*, No. 93-5339, 1993 WL 460716, at *1 (4th Cir. Nov. 9, 1993) (per curiam); *see also* 5 Am. Jur. 2d *Appellate Review* § 740 (2007) (noting that the mandate rule "requires a lower court to act on the mandate of an appellate court, without variation" and that "a lower court cannot give any other or further relief beyond the scope of the mandate"). One such extraordinary circumstance is "a dramatic change in controlling legal authority." *United States v. Moore*, 83 F.3d 1231, 1234 (10th Cir. 1996).

¶33    The Arizona Supreme Court has rejected an argument similar to the one the Okelberrys raise here. *See Jordan v. Jordan*, 643 P.2d 1008 (Ariz. 1982). In *Jordan*, the court considered "whether a trial court may deviate from the mandate of an appellate court because of an intervening change in controlling law and, on remand, decide the case contrary to the instructions contained in the mandate." *Id.* at 1009. The parties to the case sought dissolution of their marriage. *Id.* They owned property as joint tenants with right of survivorship. *Id.* The legislature had earlier amended the relevant statute to permit the trial court to include joint tenancy property in the equitable division of marital assets. *Id.* The trial court distributed the joint tenancy property to the wife, and the husband appealed. *Id.* The Arizona Court of Appeals reversed, concluding that the amendment to the statute applied only prospectively and that therefore joint tenancy property acquired before the amendment was not subject to equitable division. *Id.* Before the trial court could consider the case on remand, the legislature amended the statute

again to give it retroactive operation over joint tenancy property acquired before the first amendment. *Id.* at 1009–10. Despite the court of appeals' holding that the trial court lacked jurisdiction over the joint tenancy property, the trial court again distributed the joint tenancy property to the wife "in light of the change in the statute." *Id.* at 1010.

¶34 In interpreting the second amendment to the statute permitting the trial court to make an equitable apportionment of the joint tenancy property, the Arizona Supreme Court noted that a trial court may deviate from an appellate mandate because of an intervening change in controlling law:

> [T]he law of the case doctrine is inapplicable where the policy of the law has been changed, by legislative enactment or decision of a higher court, while the case is still pending resolution. In reaching our decision, we do not depart from our long-held rule that after decision on appeal and remand the lower court is bound to follow the law set forth in the appellate court's opinion . . . . We hold, however, that this general rule is subject to the exception that the lower court may deviate from the mandate and apply different law from that specified by the appellate court where, while the case is still pending, and in the interim between the rendition and implementation of the mandate, there has been a change in controlling law.

*Id.* at 1013–14 (internal quotation marks omitted).

¶35 Here, as in *Jordan*, the appellate mandate set forth in *Okelberry III*, 2010 UT App 13, 226 P.3d 737, does not absolutely bind the trial court, because "the policy of the law has been changed . . . by legislative enactment . . . while the case [was] still pending resolution," *see Jordan*, 643 P.2d at 1013.

¶36 The Okelberrys argue that the mandate rule compels the trial court "to follow the instructions of the appellate courts":

> [*Okelberry III*] unambiguously stated that "impact or actual interference of public use of the roads" is not relevant. The only issue before the trial court was whether the gates were locked and the intent of placing those locks. Under the mandate from the appellate courts, whether persons were actually prevented from traveling the roads was not relevant. . . .
>
> The trial court did not, therefore, have authority to conduct a wide-ranging inquiry, but was required to focus solely on the issues framed by this [c]ourt.

Were it not for the intervening amendment to the Dedication Statute, we would agree with the Okelberrys. But in 2011, after we remanded the case to the trial court but before the court had the opportunity to consider additional evidence of the Okelberrys' intent in closing and locking the gates, the legislature amended the Dedication Statute, to clarify the statute's scope in light of the supreme court's decision in *Okelberry II*. *See* Utah Code Ann. § 72-5-104(9)(b)(ii) (LexisNexis Supp. 2011). The amended statute thus constitutes "a dramatic change in the controlling legal authority." *Moore*, 83 F.3d at 1234; *see also Jordan*, 643 P.2d at 1014. We accordingly conclude that the mandate rule does not prohibit the trial court from applying the amended version of the Dedication Statute to this case.[1]

---

1. The Okelberrys warn of "the potential mischief, indeed, the grave constitutional problems, that could arise if the Legislature were to attempt to determine the outcome of a particular case by passage of a law intended to accomplish such a purpose." *Foil v. Ballinger*, 601 P.2d 144, 151 (Utah 1979). But we do not see the

(continued…)

¶37 Because we agree with Wasatch County's contention that the amended version of the Dedication Statute applies to this dispute, we do not address its second contention that the trial court's findings of fact were insufficient under the standard set forth in *Okelberry II*.

C. Continuous Use

¶38 Wasatch County next contends that if we conclude, as we have, that the amended version of the Dedication Statute applies retroactively, we should "overturn the [trial] court's findings that the roads in this case were not dedicated to the public." Wasatch County argues that the trial court conditionally—but correctly—ruled that "if the statute did apply retroactively, then all of the roads at issue in the case would be dedicated to the public." "We review questions of statutory interpretation for correctness, affording no deference to the district court's legal conclusions." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 12, 267 P.3d 863 (citation and internal quotation marks omitted). And "[w]hen reviewing a bench trial for sufficiency of evidence, we must sustain the trial court's judgment unless it is against the clear weight of the evidence [presented at trial], or if the appellate court otherwise reaches a definite and firm conviction that a mistake has been made." *Kendall Ins., Inc. v. R & R Group, Inc.*, 2008 UT App 235, ¶ 9, 189 P.3d 114 (second alteration in original) (citation and internal quotation marks omitted).

---

(…continued)

amendment as an attempt to determine the outcome of this case. We see it as an attempt to clarify the statute's original intended meaning by referencing cases that have interpreted its meaning. True, the amendment names those cases. But we have no reason to believe the legislature sought to manipulate their outcomes.

¶39   Under the amended version of the Dedication Statute, a landowner can defeat public dedication by, among other methods, interrupting the public's continuous use of the roads:

> (1)(a) A highway is dedicated and abandoned to the use of the public when it has been continuously used as a public thoroughfare for a period of ten years.
>
> . . . .
>
> (3)(a) Continuous use . . . is interrupted only when the regularly established pattern and frequency of public use for the given road has actually been interrupted to a degree that reasonably puts the traveling public on notice. . . .

Utah Code Ann. § 72-5-104 (LexisNexis Supp. 2011).

¶40   In the portion of its January 14, 2014 "Findings of Fact and Conclusions of Law" discussing the amended version of the Dedication Statute, the trial court correctly focused on whether any actual interruption reasonably placed the traveling public on notice that the Okelberrys sought to interrupt continuous use. The court noted that if the amended version of the Dedication Statute applied to this case, then the roads would be dedicated to the public:

> Clearly if the statute could be applied retroactively, there has been significant testimony from Wasatch County witnesses that they were not on notice that the roads were not public roads as they never encountered any interruption, and the roads would be dedicated to the public use.

¶41   The trial court's findings of fact support its conclusion. In its March 6, 2013 memorandum decision, the trial court found that Wasatch County produced fourteen witnesses who testified

that "they had used the roads during the 1960s, 1970s, and 1980s without encountering a locked gate." The court noted that most of Wasatch County's witnesses "testified that they first encountered locked gates in 1989 or the early 1990s" and that while "[s]ome of the witnesses testified that they had seen closed gates, . . . the gates were not locked and it did not impede their travel." One Okelberry witness testified that the Okelberrys "would lock the gates every year at the end of June when they moved their sheep." Another testified that the gates "were locked to keep out the public so that sheep would not get out onto the Forest Service property before July 1 of each year" and that he saw "people go up to this locked gate and turn around" during that time. A third witness testified that "it was important to keep the gates locked each year at these times so [the sheep] would not go onto the Forest Service property too early." Brian Okelberry testified that "the purpose of locking the gates was to keep people from going onto the property because they would not close the gates, and the gates had to be secure to keep the sheep in the right location."

¶42    From this testimony, the trial court found that "the gates were not locked often enough to put the public on notice that the roads were not for public use." The trial court then concluded that if the amended version of the Dedication Statute applied, "then the roads would be dedicated to the public." The trial court's conclusion does not run "against the clear weight of the evidence." *Kendall Ins., Inc.*, 2008 UT App 235, ¶ 9 (citation and internal quotation marks omitted). First, even those Wasatch County witnesses who recalled closed gates testified that the gates "were not locked and it did not impede their travel." Second, several witnesses testified that the Okelberrys closed and locked the gates. But while the Okelberrys periodically closed the roads, they closed the roads at regular intervals to control livestock. These interruptions thus did not impair "the regularly established pattern and frequency of public use for the given road[s]." Utah Code Ann. § 72-5-104(3)(a).

¶43    In short, although it erroneously failed to apply it, the trial court correctly interpreted the amended version of the Dedication Statute, and sufficient evidence supported its conclusion that under the amended version, the Okelberrys had dedicated all of the roads at issue to public use. Moreover, the Okelberrys have not argued on appeal that even if the amended version of the Dedication Statute applies to this case, they would nonetheless prevail. Accordingly, we agree with Wasatch County that the Okelberrys dedicated the roads at issue in this case to public use.

## II. "Overt Act" Cross-Appeal

¶44    Finally, on cross-appeal the Okelberrys contend that the trial court erred in failing to recognize that employing gates— even unlocked gates—constitutes an overt act that interrupts public use as a matter of law. "The presence of gates clearly interrupts public use," they maintain, because "[a]lthough individuals may be able to open the gates and still use the roads, the presence of those gates still requires the user to stop and open the gates." They argue that the "law therefore holds that the maintenance of gates creates a presumption that the use was permissive and therefore interrupted use of the road 'as a public thoroughfare.'"

¶45    Utah courts have already considered this question and have concluded that the presence of locked or unlocked gates should be weighed as one of many factors that a court may consider in determining whether public use was continuous as a matter of law:

> [T]he presence of obstructions or gates, open or closed, unlocked or locked, has been treated as only one of the many factors a trial court may consider when determining if the public use was continuous. Indeed, the Utah Supreme Court has declined opportunities to rely solely on the

> presence of a gate, locked or unlocked, to affirm trial courts' determinations that roads have not been dedicated to the public.

*Okelberry I*, 2006 UT App 473, ¶ 15, 153 P.3d 745 (citing *Thomson v. Condas*, 493 P.2d 639, 640–41 (Utah 1972)), *rev'd on other grounds*, 2008 UT 10, 179 P.3d 768. In fact, in *Okelberry III*, we remanded the case on the ground that "the trial court failed to make factual findings as to whether and when the Okelberrys locked the gates." 2010 UT App 13, ¶ 15, 226 P.3d 737 (citing *Okelberry II*, 2008 UT 10, ¶ 19).

¶46 In *Utah County v. Butler*, our supreme court approved the trial court's conclusion that a property owner abandoned a road and dedicated it to public use. 2008 UT 12, ¶ 29, 179 P.3d 775. In reaching its conclusion, the trial court explained that "there have historically been gates across the [r]oad for purposes unrelated to obstruction of traffic." *Id.* ¶ 25. "An unlocked gate is consistent with this pattern and would not be considered to violate the [public's] right-of-way . . . ." *Id.* (citation and internal quotation marks omitted).

¶47 In short, Utah caselaw has considered and rejected the Okelberrys' contention that "the presence of gates clearly interrupts public use." Nothing the Okelberrys have presented on appeal compels us to reconsider this settled law. Accordingly, the Okelberrys' cross-appeal fails.

CONCLUSION

¶48 That portion of the trial court's judgment ruling that some of the roads in question were not dedicated to the public is reversed. The judgment of the trial court is in all other respects affirmed.

———————