Sharol G. AUSTIN, now Batson, Appellant,

v.

WILKERSON, INC., a corporation,
Appellee.

No. 46133.

Supreme Court of Oklahoma.

Feb. 26, 1974.

Van Cleave, Gresham, Bivens, Clark & Bennett by Wendell W. Clark, Chapel, Wilkinson, Riggs & Abney by Benjamin P. Abney, Tulsa, for appellant.

Ungerman, Grabel & Ungerman, Tulsa, for appellee.

BARNES, Justice:

Appellant [hereinafter referred to as "plaintiff"] and her now divorced former husband, William L. Austin, purchased a used 1969 Model Plymouth Fury III two-door hardtop sedan automobile from the Appellee, Wilkerson, Inc. [hereinafter referred to as "defendant"], on Saturday, September 20, 1969, at a listed price of $2,995.00. When they were looking at this auto before deciding to purchase it, defendant's salesman, Bill Bates, told the couple that it had been used in the driver's education program of the Tulsa Public Schools. The prospective purchasers told Bates they were looking for a "low mileage" car and the odometer portion of the Fury's speedometer represented its accumulated mileage as being less than 8,200 miles.

A few days later, plaintiff was looking through the auto's glove compartment and found an Oklahoma Motor Vehicle Inspection Certificate dated January 22, 1969, which set forth a "mileage reading" of "9821". After noticing that the "identification number" on the certificate was the same as that on the Fury and then checking the authenticity of the certificate by a telephone call to the Oklahoma Inspection Bureau, plaintiff and her husband concluded that the odometer misrepresented the actual mileage that the auto had traveled, and, in early October, instituted the present action against defendant, alleging that the Fury, at the time they purchased it, and unbeknownst to them, had been driven in excess of 23,700 miles and "was worth a considerable amount less" than if it had been driven only 8,197 miles. By reason of defendant's alleged "false and fraudulent misrepresentation and deceit", in the sale of the Fury to them, plaintiffs sought recovery from defendant of $775.00 in actual damages and $25,000.00 in punitive damages with 10% interest from the date of the purchase, and costs of the action.

After plaintiff and Austin were divorced, he dismissed his cause of action against defendant, and, after plaintiff married her present husband in 1971, she amended the petition in the present action to show that it was being continued by her as sole plaintiff under her new name.

At the close of a trial of the issues joined by plaintiff's petition, as amended,

and an answer in the form of a general denial filed by defendant, the trial court sustained defendant's motion for a directed verdict and thereafter entered judgment accordingly.

In her present appeal asking this Court to order a new trial of the case, plaintiff seeks to show that the trial court erred in directing the verdict because there was sufficient evidence of actionable fraud on the part of the defendant to have warranted submission of the case to the jury. Defendant takes the opposite position and contends that plaintiff failed to discharge her burden of establishing the recognized seven elements of fraud. The Court of Appeals, Division No. 1, upheld plaintiff's position, reversed the trial court, and remanded the case to that court for a new trial. We affirm the Appeals Court's opinion as herein modified.

In dealing with their opposing positions, we hereinafter describe material portions of the evidence adduced by the respective parties.

While testifying to the afore-stated facts and others, plaintiff identified the aforementioned Motor Vehicle Inspection Certificate; and it was introduced in evidence as plaintiff's Exhibit 1. On cross-examination, plaintiff testified that defendant delivered the Fury to its purchasers on Monday, September 22, 1969; that this couple was divorced in May, 1970, and that thereafter she married her present husband in January, 1971. When she was recalled to the witness stand, plaintiff also testified that she would not have purchased the Fury if she had known that the mileage on it was different than was represented on its speedometer.

Plaintiff's second witness, Melton E. Ramsey, who lived in the Catoosa area, had taught in Tulsa's public school system five years and taught driver's training at Tulsa's Edison High School during 1969, identified the Fury involved as the one he obtained new on loan at defendant's Chrysler-Plymouth Agency the first week or ten days of October, 1968, and drove more than 23,000 miles in his work of teaching driv-

er's education, as well as on some short trips out of town, including weekly journeys to a night school he was attending in Tahlequah, Oklahoma, before he returned the car to defendant at the end of the summer school session in the latter part of July, 1969. When plaintiff's Exhibit 1 was shown to this witness, he acknowledged that it bore his name, and identified it as the Motor Vehicle Inspection Certificate he received when he had the car inspected and the headlights adjusted at one of defendant's service facilities. Additionally, Mr. Ramsey's testimony revealed that while he possessed the car, it had some of the same defects that plaintiff and her husband discovered after they purchased it.

Another of plaintiff's witnesses, Robert L. Temple, manager of a Tulsa auto appraisal business, gave testimony to the effect that when plaintiff and her husband purchased the Fury it was worth $775.50 less, after having been driven more than 23,000 miles, than it would have been if it had been driven only the 8,190 miles shown on its odometer.

For the defendant, its former salesman, Bates, testified by deposition that he was hired to sell cars for defendant on a salary and commission basis in March, 1969, by its general manager, John Esche. Bates testified that, as far as he knew, he was the only one of defendant's salesmen who dealt with plaintiff and her husband in the purchase of the Fury. He further testified that defendant had caused this car to be delivered from one of its downtown locations at Tulsa's 8th and Boulder Streets to its used car lot in the 3800 block on East 11th Street only a short time before the sale was made; and he did not know anything about the car's history except that it had been used in Tulsa's driver's education program. Bates first testified that he did not recall whether or not he had made any representations to the purchasers concerning the car's mileage, but that he "possibly could have." Later in his testimony, however, Bates denied that he had told them the Fury was a "low mileage" car. This witness further testified, in substance, that

when a car that defendant wanted to sell needed work done on it, a "make ready" was first prepared showing what needed to be done to it for its sale. When asked which of the persons in defendant's management authorized the preparation of such cars, Bates deposed that defendant's general manager, Esche, or sales manager, Don Combs, were possibly the ones most likely to do this.

Defendant's witness, A. D. House, an independent used car dealer, testified, among other things, that the first things prospective purchasers look for in used cars are their appearance and condition. On cross-examination, he first testified that it did not make any difference to him what mileage a used car's odometer showed. On further questioning by plaintiff's counsel, he stated that a turned back odometer "is a false reading of the condition of a car" and that this is done to enhance its value in the eyes of the buyer.

For defendant, its general manager, Esche, testified that the special used car sale at which plaintiff and her former husband purchased the Fury, and during which all of defendant's "downtown locations" were closed, was arranged because defendant had a "tremendous number" of 1969 model cars on hand and it was getting pretty close to the time the 1970 models would be introduced. He further testified that the cars were priced as they were because he wanted "to dispose of numbers." On cross-examination, Esche testified that "for the most part" he was the one who developed the defendant's business policies, but he denied that it was one of those policies to turn back the mileage on high mileage automobiles to lower mileages in order to make them more salable. When asked directly if he had ever done that, he answered: "No, sir." He further testified on cross-examination that the warranty on an automobile manufactured by Chrysler is no good if Chrysler learns that its mileage has been altered. In this connection, he further testified that each time work is done on such a car by any Chrysler-Plymouth service department, during the warranty period, its speedometer reading goes into a master computer, so that, if the reading is altered below the mileage shown by the computer, Chrysler rejects the warranty.

Mr. Truman R. Brown, who was formerly employed at defendant's Rambler dealership and at one of its used car lots from sometime in August, 1969, until sometime in May, 1970, appeared, for plaintiff as a rebuttal witness for impeachment purposes. Part of his examination reads as follows:

"Q. . . . would you please describe . . . the general business policy of Wilkerson, Inc., concerning used cars concerning getting them ready for sale?

\* \* \* \* \* \*

"A. . . . as best I remember, . . . when we received the cars . . . they were cleaned up in detail and repairs were made to them as were necessary, *and on very high mileage cars, or cars that cleaned up real nice and they thought they would bring a better price then the speedometers were turned back on them.*

"Q. Okay, did you ever witness anybody turning back the speedometer on cars at Wilkerson, Inc.?

"A. Yes, sir.

\* \* \* \* \* \*

"Q. Who would do this, sir?

"A. . . . I believe the man's name was Hoy Raines.

\* \* \* \* \* \*

"Q. And for whom was he employed?

"A. I think he was self-employed.

"Q. Do you know the name of his company?

"A. As I recall it was Oil Capitol Speedometer Repair.

"Q. Do you know how much he charged Wilkerson, Inc.?

"A. I believe it was $5.00 a car.

"\* \* \*" [Emphasis added.]

Defendant concedes that fraud may be established by circumstantial evidence,

but it calls our attention to the presumption against fraud and in favor of honesty and fair dealing. Its counsel assert that the evidence of fraud "must be so influential as to overcome any and all opposing evidence and so as to repeal that opposing presumption that honesty and fair dealing occurred." This argument ignores the fact that, in ruling upon defendant's motion for a directed verdict, the trial court was not called upon to weigh all of the evidence, including that of the defendant, and determine in whose favor it preponderates. It is well established that:

"A motion for directed verdict . . . should not be sustained unless there is an entire absence of proof tending to show a right to recover, and in passing on the same the trial court must consider as true, all of the evidence favorable to the party against whom motion . . . is directed, together with all inferences that reasonably may be drawn therefrom and disregard all conflicting evidence favorable to the movant." Central Mutual Insurance Company v. Dickason, Okl., 451 P.2d 1, cited in Morris Chevrolet, Inc. v. Pitzer, Okl., 479 P.2d 958, 961.

Notice also Scovil v. Chilcoat, Okl., 424 P.2d 87. Thus it will be seen that, under the proper rule, plaintiff did not have the burden of "overcoming any and all opposing evidence . . ."; and, in determining the sufficiency of her evidence to withstand defendant's motion, the trial court should not have even considered conflicting evidence unfavorable to her.

But defendant further says that "Plaintiff failed to establish a *prima facie* case of fraud specifically for the reason that the evidence . . . plaintiff presented . . . failed to disclose any type of misrepresentation knowingly made on the part of the defendant concerning the true condition of the car." We disagree. It is recognized that plaintiff's evidence shows no more than a rather equivocal *oral* representation of the Fury's mileage. But it was held at least as early as 1936 that a speedometer may, in itself, constitute a misrepresentation. See Jones v. West Side Buick Auto Co., 231 Mo.App. 187, 93 S.W. 2d 1083. There, in a well-reasoned opinion, the Court said:

"Defendant argues as a matter of first insistence that no case was made by plaintiff for submission to the jury.

"The case concededly turns upon the question of the legal consequences to be ascribed to defendant's admitted act in turning back the speedometer before offering the car for sale to plaintiff. In other words, the decisive issue in the case is that of whether such act may be said to have constituted a representation on defendant's part, and, if so, of whether such act was fraudulent and malicious.

"Defendant first argues that the mere turning back of the speedometer could not have constituted a representation; * * *

" * * * The sole purpose of manufacturers in equipping automobiles with speedometers which register total mileage is to show at all times the total number of miles that the particular car has gone. In fact, speedometers are so built and constructed that the average person would not know how or have the power to change the mileage reading upon them if he wished. In ordinary usage, when one looks at a speedometer reading, he feels that he is rightfully entitled to rely upon that reading and to believe that the car has gone the number of miles shown by the speedometer and no more. * * *

"The only possible reason defendant could have had in turning the speedometer back was to make it appear that the car had been run only the number of miles which the speedometer was made to indicate. We grant that the record discloses no statement by defendant either oral or written regarding the mileage of the car. However, a representation is not confined to words or positive assertions; it may consist as well of deeds, acts, or artifices of a nature cal-

culated to mislead another and thereby to allow the fraud-feasor to obtain an undue advantage over him. [Citing cases] Both reason and precedent tell us, and we so rule, that a representation with reference to the mileage of an automobile is a representation with reference to a material fact, and that it is none the less a representation of such a material character if made through the medium of turning back the speedometer than if made by word of mouth or written guarantee. [Citing cases]"

Other cases where odometers were turned back are listed in Boise Dodge, Inc. v. Clark, 92 Idaho 902, 453 P.2d 551, 555, footnote 5. In accord with the foregoing, and with the rule allowing fraud to be proved by circumstantial evidence, and with the rule quoted from Dickason, supra, requiring consideration of reasonable inferences to be drawn [in this case] from the evidence favorable to plaintiff [without consideration of any conflicting evidence favorable to defendant], it is our opinion that the evidence was sufficient to make out a prima facie case for submission to the jury as to whether or not defendant had caused the Fury's odometer to be turned back more than 15,000 miles, thereby fraudulently misrepresenting to plaintiff and her former husband the auto's true mileage. As far as the record shows, defendant had, or should have had, a record of the mileage shown on the Fury's odometer previous to the time that [according to plaintiff's evidence] it must have been turned back. At least, we think it had the "means of knowledge" that the odometer, at the time of the sale, constituted a misrepresentation of the Fury's mileage [37 Am.Jur.2d, Fraud and Deceit, §§ 201, 446], especially in view of the undisputed fact that one of the defendant's service facilities had issued a Motor Vehicle Inspection Certificate showing that as early as January, 1969, the Fury had already traveled more miles than were shown on the odometer when plaintiff and her husband purchased it. In this connection, notice the requirement of Tit. 47 O.S. 1971 and 1967

Supp., § 856(b), as to the records and reports to be made "by official inspection stations on every inspection and every certificate so issued." We think the circumstances shown by plaintiff's evidence indicate more than the "mere suspicion of knowledge" referred to in Rice v. Bragassa Motor Co., 177 Okl. 636, 61 P.2d 690, relied upon by defendant. It is, therefore, our opinion that the cited case is inapposite here.

We do not attach the significance reiterated in defendant's brief to the fact that plaintiff's former husband, after the couple's divorce, dismissed himself from this case. Evidently plaintiff's ownership in the Fury and her chose in action, if any, against defendant survived the divorce. At any rate, no direct attack on her right to continue the action was ever made and supported by evidence in the trial court.

As above indicated, it was not necessary for plaintiff, in order to be entitled to have defendant's motion for a directed verdict denied, to prove by "clear and convincing" evidence that defendant misrepresented the Fury's mileage, with knowledge that it was so doing, and with the intention, that said misrepresentation should be acted upon by plaintiff. We think the following quotation found in Griffith v. Scott, 128 Okl. 125, 261 P. 371, is particularly applicable to this case:

"Fraud may be proved by circumstantial evidence. Indeed, from its nature it is difficult to prove it by direct evidence, and it is seldom that it can be so proved. Hence it is more often shown by circumstances than in any other way. It is impossible, however, to enumerate the facts from which it may be inferred. Each case must depend on its own facts, and all the facts and circumstances connected with and surrounding the transaction are to be considered together in determining whether it was fraudulent. Facts of trifling importance when considered separately, or slight circumstances trivial and inconclusive in themselves, may afford clear evidence of fraud when considered

in connection with each other. It has been said that in most cases fraud can be made out only by a concatenation of circumstances, many of which in themselves amount to very little, but in connection with others made a strong case."

See also 37 Am.Jur.2d, Fraud and Deceit, §§ 439, 472, and 477.

Having concluded that plaintiff was entitled to have defendant's motion for a directed verdict overruled, we grant certiorari, affirm the decision of the Court of Appeals as herein modified, reverse the trial court's order sustaining defendant's motion for a directed verdict and its judgment in accord therewith, and remand this case to that court, directing it to order a new trial.

DAVISON, C. J., WILLIAMS, V. C. J., and IRWIN, HODGES, LAVENDER and DOOLIN, JJ., concur.