**2016 UT App 9**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
CLAIR RULON HAWKINS,
Appellant.

Opinion
No. 20130468-CA
Filed January 22, 2016

Third District Court, Salt Lake Department
The Honorable James T. Blanch
The Honorable Randall N. Skanchy
No. 091907065

Marcus R. Mumford and Joshua S. Ostler, Attorneys
for Appellant

Sean D. Reyes and Karen A. Klucznik, Attorneys
for Appellee

JUDGE J. FREDERIC VOROS JR. authored this Opinion, in which
JUDGE MICHELE M. CHRISTIANSEN and SENIOR JUDGE JAMES Z.
DAVIS concurred.[1]

VOROS, Judge:

¶1      This appeal arises from a fraud scheme related to real
property near Park City, Utah. Appellant Clair Rulon Hawkins
was originally charged as one of the perpetrators of the scheme

---

1. Senior Judge James Z. Davis began his work on this case as a
member of the Utah Court of Appeals. He retired from the court,
but thereafter became a Senior Judge. He completed his work on
this case sitting by special assignment as authorized by law. *See
generally* Utah R. Jud. Admin. 11-201(6).

with three counts of communications fraud and one count of engaging in a pattern of unlawful activity. Sandra Chapple and Kimberly Bowen were also charged in relation to the scheme. Hawkins was ultimately tried separately on two counts of communications fraud, both second degree felonies. A jury acquitted Hawkins on the first count of communications fraud but convicted him on the second count. Hawkins appeals. We affirm.

## BACKGROUND[2]

¶2     Empire Custom Homes (Empire Homes) was a limited liability company, registered in October 2006. It was managed by another Utah company, of which Bowen and Chapple served as directors and as president and vice president. In addition to the Empire entities, Bowen and Chapple operated several related companies.[3] Hawkins began working for Empire Homes in November 2007.

¶3     The State charged Hawkins with two alleged fraudulent schemes. The first promised a return of $300,000 on an investor's refundable deposit of $40,000. The jury acquitted Hawkins of this charge. The facts underlying the second scheme, discussed below, formed the basis for the second count of communications fraud, of which Hawkins was convicted.

¶4     In April 2008, Empire Homes entered into an agreement to purchase lots in the Deer Canyon Development from a

---

2. "On appeal, we review the record facts in a light most favorable to the jury's verdict." *State v. Jeffs*, 2010 UT 49, ¶ 3, 243 P.3d 1250 (citation and internal quotation marks omitted). We recite the facts here accordingly.

3. We refer to all of these related entities generally as Empire Homes.

development company called DPC. DPC owned 87 lots in the Deer Canyon Development. However, DPC lacked the funds to complete the utility infrastructure for the lots, such as natural gas, power, and a booster station for water delivery. Thus, the agreement provided that for every lot Empire Homes re-sold, DPC would receive $50,000 from the sale proceeds to complete the infrastructure. But DPC needed more than sporadic $50,000 payments; it needed a total of at least $650,000. Thus, closing on 13 lots within the given time frame would give DPC enough money to complete the infrastructure in that phase of the development. Accordingly, Empire Homes agreed, among other things, to close on 13 of the 87 lots by June 12, 2008, to raise enough money to complete the infrastructure in that phase of the development.

¶5 Despite this agreement, Empire Homes did not close on any lots. To assuage DPC, Chapple put DPC into contact with Hawkins, whom she represented would handle all financing necessary to close on the lots. Hawkins represented to DPC that he had access to $70 to $80 million held in a private trust that would provide funding for the project. However, none of the promised funding materialized. Consequently, Empire Homes and DPC failed to close on enough lots, DPC defaulted on its loan on the properties it owned in the Deer Canyon Development, and DPC's lenders foreclosed. But before the foreclosure, Empire Homes closed on lots 39 and 41. Both were purchased by the victim in this case.

¶6 The victim had owned a business in Colorado. He sold the business, realizing almost $1 million in profit. He intended to invest some or all of this money in a real property purchase known as a "1031 exchange."[4] The victim's brother-in-law, a

---

4. In general, a 1031 "like-kind" exchange allows the seller of property to defer payment of taxes on the proceeds of a sale if the seller "reinvests the proceeds in similar property as part of a

(continued…)

realtor licensed in Colorado, found Empire Homes through its website.

¶7     In March 2008, the victim contacted Empire Homes. His first contact with Empire Homes occurred when he spoke with Chapple over the phone. The victim and Chapple set a date for him to come to Utah. Once in Utah, the victim and his brother-in-law met with Chapple and Hawkins at Empire Homes' office. Then the victim, his brother-in-law, Chapple, and Hawkins all went to look at the Deer Canyon Development. The victim toured seven or eight multi-million dollar homes that another developer had built in Deer Canyon. The victim expressed interest in purchasing one of these existing homes. But Chapple and Hawkins told him that the existing homes were worth $2.5 to $3 million and had "to be paid for right then and there," and the victim did not have enough money to do that. While touring the development, the victim's brother-in-law asked Hawkins "about utilities, [he] asked him about water and all those kinds of services and if utilities and water [were] available to all the properties." Hawkins affirmatively represented that "utilities were not a problem and . . . that water was not a problem."

¶8     The victim testified that no one from Empire Homes pitched the $40,000 investment opportunity to him, because "they knew [he] was coming in with a lot more money." Rather, Chapple and Hawkins presented the victim with various other options related to his potential investment in the Deer Canyon Development. The option the victim chose required him "to purchase the land and then they would pay [him] a monthly stipend to build a home." The victim understood that each of the

---

(…continued)

qualifying like-kind exchange." Internal Revenue Service, FS-2008-18, Like-Kind Exchanges under IRC Code Section 1031 (2008), http://www.irs.gov/uac/Like-Kind-Exchanges-Under-IRC-Code-Section-1031.

homes built would cost $2.5 million "but would sell for $3.5 million."

¶9      Based on the representations made to him, the victim believed that he and Empire Homes "would work together in building" the homes, and "were going to split the profits." He was also led to believe that Chapple and Hawkins "were going to take care of all of the things that needed to be done." The victim described Hawkins as Chapple's partner and a promoter of the scheme:

> Well, it's just that he was a partner with [Chapple] or a friend, you know, I took it that they were partners because why else would he be there other than to promote or be a part of this whole thing? . . . [H]e was a promoter. [He said things like,] "She's done a great job before; I've worked with her before; she's on top of this, she's a great general contractor; it's all going to work out so good; they've got such a good game plan, the way we build our houses is like no other."

The victim also understood, from what he had been told about how Empire Homes built houses, that "everything would be set up from the digging to the teams coming in with the concrete . . . everything, the plumbers, the electricians, [Chapple] knew lots and lots of people that would come in and they would put these houses up and they would get this whole project done."

¶10      In addition, the victim was told that Empire Homes was "going to pay [him] $8,300 a month [to lease the property] so they could start building and [the victim and Empire Homes] could work together as a team to build a house that would go into a rental pool or be sold and [they] would split the profits." And Chapple represented to the victim that "if the house didn't sell for what they said it was worth," that they had an "insurance policy [that] would make up the difference." The

victim's brother-in-law testified that Hawkins made the same representation about an insurance policy to him. The document describing the supposed "insurance policy" proclaimed, "Imagine something so great, it makes all the 'what if's' go away!"[5]

¶11 The victim decided to purchase two lots in the development—lots 39 and 41—and executed a real estate purchase contract for each. But before the victim signed the contracts, Hawkins called the victim's brother-in-law and explained that if the victim could sign the contracts before April 15, "there would be some favorable tax implications to the developer and that they would be willing to take [the victim] on a Disney Cruise to the Mexican Riviera," which "would be paid for by the developer." The victim signed the real estate purchase contract for lot 39 on April 11, and signed the contract for lot 41 on April 30.

¶12 More than two weeks *after* the victim signed the contract to purchase lot 39, and on the same day that he signed the contract to purchase lot 41, Empire Homes had the victim sign a "risk disclosure statement." This document provided, in relevant part, that if Empire Homes sold one of the victim's lots, "Empire will pay you, out of the sale proceeds, the full price that you originally paid for the Lot, and Empire will keep all profits"; that "Empire cannot guarantee that you or Empire will be able to obtain financing for your purchase" of the lots; that "Real estate investments are not insured by the FDIC or any other government agency"; and that "Empire, its principals, and associates do not guarantee the success of you[r] investment."

¶13 Hawkins took credit at trial for the creation of the risk disclosure statement. He testified that he asked an attorney for Empire Homes to draft something that "disclose[d] everything

---

5. An expert witness testified that no insurance policies of this sort exist in the State of Utah.

that could possibly go wrong with this type of transaction." Hawkins also testified that when the victim signed the document, he "felt very comfortable because [he] felt great relief that now [the victim] was informed and knew everything that [Hawkins] knew," and it "brought [him] great solace when [the victim] signed it."

¶14    In the end, the victim put approximately $423,000 down on each lot. Even though each lot cost $1.1 million, the victim understood that Chapple and Hawkins would secure the funding for the balance owed on the property. The victim testified, "It was Empire [that] was going to get the rest of the money to pay for this"; "they were coming in with the other money." Specifically, the victim testified that he "was always told" the money would come from "a family trust," that "a family trust was going to come in and buy the whole lot, [and] supply the money for the entire project." Empire Homes deposited the victim's down payment into an account created by Chapple and Bowen a few days later. The account consisted solely of the victim's investment; Chapple and/or Bowen transferred funds from the account to the Empire Homes payroll account and to their own personal accounts. In addition, the victim's investment paid for ten Disney Cruise Line reservations—reservations that Hawkins represented the developer would buy.

¶15    Nothing happened as the victim had been led to believe it would. After some time elapsed and Empire Homes had yet to obtain financing for the balance owed on the lots, Chapple asked the victim to obtain a thirty-day bridge, or hard-money, loan for the balance of the purchase price. "She said. . . that she would pay the—or Empire Custom Homes would pay the one-month's rent, shall we say on the money, and then pay back the loan as soon as they got financing, that this wasn't going to go any longer than 30 days." Shortly after the victim completed the thirty-day bridge loan he started receiving calls "that no payments were being made on the hard money loans."

¶16    The victim talked to both Chapple and Hawkins to determine where the project's financing stood and what was going on. He received assurances from both Chapple and Hawkins that the financing was almost squared away. Chapple also told him that she had made payments on the hard money loans, but the victim realized that Chapple had not made any payments when the lenders began foreclosure proceedings. The victim became desperate and reached out to Hawkins through an email, pleading with Hawkins as "a man of God" to put him in touch with the buyer Hawkins had represented might buy the lots:

> This letter is to inform you that I look at our relationship as a friendship not a business relationship. In these tough times you need the help of good people. I respect you and consider you a man of God. I need your help in contacting the man you know who may be interested in purchasing lots 39 and 41. I know you are not a realtor or a loan originator just a friend who is trying to help a situation. Please approach this man and tell him I would be willing to part with the lots at the cost of the hard money lenders.

Despite promises from Hawkins and Chapple that the funding would come through, it did not; consequently, lenders foreclosed on both lots. The victim lost the approximately $852,000 he had put down.

¶17    In the wake of these events, Hawkins was charged with three counts of communications fraud and one count of engaging in a pattern of unlawful activity. After a preliminary hearing he was bound over on only two counts of communications fraud. Hawkins moved to quash the bindover on the ground that the evidence was insufficient. The trial court denied Hawkins's motion and set a trial date of May 24, 2012. On May 23, 2012, the State moved to continue trial on the basis

that one of its material witnesses, who lived out of state, had suffered complications from surgery and could not travel to testify. The court granted the State's motion. The court held a scheduling conference in June and a pretrial conference in December. Approximately ten days after the December pretrial conference, Hawkins moved to dismiss for lack of a speedy trial. The court denied his motion.

¶18 The matter proceeded to trial on January 11, 2013. The same day, Hawkins moved the court to find him indigent and to appoint his current counsel; however, he stated that no matter the court's decision on the motion, his current counsel would continue to represent him. The court did not rule on this motion until after trial.

¶19 At the close of the State's evidence, Hawkins moved for a directed verdict. The court denied the motion, ruling that the evidence was sufficient to submit the case to the jury.

¶20 The jury convicted Hawkins on one count of communications fraud. After trial, the court denied Hawkins's indigency motion. Hawkins appeals his conviction and the denial of his motion for a determination of indigency and appointment of counsel.

ISSUES ON APPEAL

¶21 Hawkins raises five issues on appeal. First, Hawkins contends that the trial court erred in refusing to quash the bindover or direct a verdict of acquittal on the ground that sufficient evidence did not establish that "he 'devised' the alleged scheme."

¶22 Second, Hawkins contends that the trial court erred in refusing to instruct the jury that before it could find him guilty based on "material omissions," it first had to find that he had a duty to disclose.

¶23     Third, Hawkins contends that he was denied his right to a fair trial on the basis that one expert witness impermissibly withheld testimony, another expert witness's testimony exceeded its permissible scope, the prosecutor engaged in misconduct, and the jury was not properly instructed.

¶24     Fourth, Hawkins contends that the trial court denied his constitutional right to a speedy trial.

¶25     Finally, Hawkins contends that the trial court erred in denying his motion for appointed counsel.

ANALYSIS

I. Sufficient Evidence Established That Hawkins Devised a
Scheme to Defraud

¶26     Hawkins contends that the trial court erred in denying his motion to quash the bindover and his motion for a directed verdict. Both motions argued that the State presented no evidence that Hawkins "devised" the scheme of which he was convicted. Specifically, Hawkins argues that the trial court wrongly interpreted "the communications fraud statute to apply to anyone who had 'participated' in a scheme" as opposed to interpreting the statute to apply to anyone who "devised" a scheme.

A.     The Motion to Quash

¶27     Hawkins contends that the trial court erred in denying his motion to quash the bindover. The State responds that the jury's verdict of guilty beyond a reasonable doubt cured any error at the preliminary hearing stage. We agree.

¶28     To bind a defendant over for trial, the State must at a preliminary hearing "present sufficient evidence to establish that the crime charged has been committed and that the defendant has committed it." *State v. Pledger*, 896 P.2d 1226, 1229 (Utah

1995) (citation and internal quotation marks omitted). And "the quantum of evidence necessary to support a bindover is less than that necessary to survive a directed verdict motion" and is the same as the probable cause standard necessary to support an arrest warrant. *State v. Clark*, 2001 UT 9, ¶ 16, 20 P.3d 300. "The bindover standard is intended to leave the principal fact finding to the jury." *State v. Virgin*, 2006 UT 29, ¶ 21, 137 P.3d 787.

¶29　"The determination of guilt beyond a reasonable doubt rests with the fact-finder at trial." *State v. Aleh*, 2015 UT App 195, ¶ 15, 357 P.3d 12 (citing *Virgin*, 2006 UT 29, ¶ 21). Accordingly, "an error at the preliminary stage is cured if the defendant is later convicted beyond a reasonable doubt." *Thomas v. State*, 2002 UT 128, ¶ 7, 63 P.3d 672 (citation and internal quotation marks omitted); *see also, e.g.*, *State v. Hernandez*, 2011 UT 70, ¶ 29 n.3, 268 P.3d 822; *State v. Rhinehart*, 2007 UT 61, ¶ 20, 167 P.3d 1046; *State v. Winfield*, 2006 UT 4, ¶ 26, 128 P.3d 1171; *State v. Quas*, 837 P.2d 565, 566 (Utah Ct. App. 1992).

¶30　We agree with the State. Hawkins was convicted beyond a reasonable doubt of devising a scheme to defraud; this conviction cures any insufficiency of evidence at the preliminary hearing. The question then becomes whether that conviction can withstand appellate review.

B.　The Directed Verdict Motion

¶31　Hawkins contends that the trial court erred in denying his motion for a directed verdict. We understand Hawkins to assert two arguments in support of this contention. First, Hawkins argues that the trial court erred in its interpretation of what it means to *devise* a scheme within the meaning of Utah Code section 76-10-1801. We construe this as a statutory interpretation argument. "We review questions of statutory interpretation for correctness . . . ." *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 12, 267 P.3d 863 (citation and internal quotation marks omitted).

¶32  Second, Hawkins argues that, in light of the trial court's erroneous interpretation of the statutory term *devise*, the trial court erred in concluding that sufficient evidence existed to submit the case to the jury. When an appellant challenges the denial of a motion for a directed verdict based on the sufficiency of the evidence, "[t]he applicable standard of review is . . . highly deferential." *State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645. "A defendant must overcome a substantial burden on appeal to show that the trial court erred in denying a motion for directed verdict." *State v. Gonzales*, 2015 UT 10, ¶ 27, 345 P.3d 1168. "We will uphold a trial court's denial of a motion for directed verdict based on a claim of insufficiency of the evidence if, when viewed in the light most favorable to the State, some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Id.* (citation and internal quotation marks omitted).

¶33  We conclude, for the reasons discussed below, that any error the trial court may have made in interpreting what it means to devise a scheme under the communications fraud statute does not require reversal. "Even if the [trial] court did err, we will not reverse if that error was harmless." *State v. Perea*, 2013 UT 68, ¶ 97, 322 P.3d 624.

¶34  "Under our rules of statutory construction, we look first to the statute's plain language to determine its meaning." *Sindt v. Retirement Bd.*, 2007 UT 16, ¶ 8, 157 P.3d 797 (citation and internal quotation marks omitted). Utah's communications fraud statute states that, to be guilty of communications fraud, an actor must both devise a scheme to defraud and communicate for the purpose of executing or concealing that scheme:

> Any person who [1] has *devised* any scheme or artifice to defraud another or to obtain from another money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions, and who [2] *communicates* directly or indirectly

> with any person by any means for the purpose of executing or concealing the scheme or artifice is guilty of [communications fraud] . . . .

Utah Code Ann. § 76-10-1801(1) (LexisNexis 2008) (emphases added).

¶35 Because the statute does not define the term *devise* and because it "does not appear to be a technical term of art, we construe it to partake of the ordinary meaning the word would have to a reasonable person familiar with the usage and context of the language in question." *See Hi-Country Prop. Rights Group v. Emmer*, 2013 UT 33, ¶ 18, 304 P.3d 851 (citation and internal quotation marks omitted). "The starting point for discerning such meaning is the dictionary. A dictionary is useful in cataloging a range of possible meanings that a statutory term may bear." *Id.* ¶ 19. However, dictionaries "will often fail to dictate what meaning a word *must* bear in a particular context. That question will often require further refinement—of selecting the best meaning among a range of options, based on other indicators of meaning evident in the context of the statute . . . ." *Id.* (citations and internal quotation marks omitted); *see also, e.g., State v. Rasabout*, 2015 UT 72, ¶ 10, 356 P.3d 1258 ("[W]hile the ordinary meaning of a word is powerful evidence in understanding statutory text, it is not the only consideration because it is simply inclusive as to the meaning intended in a particular context.").

¶36 The dictionary defines *devise* to mean "to form in the mind by new combinations of ideas, new applications of principles, or new arrangement of parts; . . . to plan to obtain or bring about." Webster's Third New Int'l Dictionary 619 (1966); *see also* Garner's Dictionary of Legal Usage 273 (3d ed. 2011) ("[t]he general nonlegal sense of *devise* ([i.e.,] to plan or invent) is also used in legal contexts" as opposed to the term-of-art definition of *devise*, which means to bequeath or give). Accordingly, given the ordinary meaning of *devise*, and given the

context of the communications fraud statute, we conclude that the statute requires that the actor form, plan, or invent a "scheme or artifice to defraud another." *See* Utah Code Ann. § 76-10-1801(1).

¶37    Hawkins contends that the trial court misread this aspect of the statute. In support of his claim, he cites several statements and rulings of the trial court concerning the meaning of the statutory term *devise.* But these statements were all made outside the presence of the jury. The jury heard only the jury instructions. And Hawkins advances no challenge to those jury instructions, nor does he identify any incidental harm he may have suffered based on the trial court's statements.

¶38    Instruction 29 directed the jury that before it could convict Hawkins of communications fraud, it had to find, among other requirements and beyond a reasonable doubt, that he "devised a scheme or artifice to obtain from another money, property, or anything of value by means of false or fraudulent pretenses, representations, promises, or material omissions." Instruction 30 explained to the jury that "'Devise' means to contrive, plan, or elaborate." Though Instruction 30 does not perfectly conform to the dictionary definitions of *devise* discussed above, it conforms to "the ordinary meaning the word would have to a reasonable person." *See Hi-Country Prop. Rights Group*, 2013 UT 33, ¶ 18 (citation and internal quotation marks omitted). Hawkins does not contend otherwise.

¶39    Accordingly, because Hawkins does not challenge the jury instructions on this point, and claims no incidental harm flowing from his discussions with the trial court, any error in the trial court's oral ruling on what it means to devise under the communications fraud statute was harmless. We next consider whether sufficient evidence supported the jury's finding, in support of Hawkins's conviction, that he devised the scheme to defraud.

¶40     Hawkins argues that the trial court erred in denying his motion for a directed verdict because the State "never introduced evidence of how [Hawkins] 'devised,' 'formed,' or 'planned,' the alleged scheme." When reviewing "a claim of insufficiency of the evidence, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Nielsen*, 2014 UT 10, ¶ 30, 326 P.3d 645 (citation and internal quotation marks omitted). Viewing the evidence in this light, "[w]e will uphold the trial court's decision if . . . we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183 (alteration in original) (citation and internal quotation marks omitted).

¶41     In addition, a defendant "cannot complain of the insufficiency of the evidence to sustain the verdict, though the [S]tate failed to make a case, if he himself proved one for it." *State v. Stockton*, 310 P.2d 398, 400 (Utah 1957) (citation and internal quotation marks omitted); *see also State v. McCallie*, 2016 UT App 4, ¶ 44 (same); *id.* ¶ 42 n.8 (observing that all federal circuits and most states follow this "waiver rule"). Thus, in examining a challenge to the sufficiency of the evidence, we review the record as a whole.

¶42     The evidence that Hawkins had a role in devising this fraudulent scheme was largely circumstantial. But "it is a well-settled rule that circumstantial evidence alone may be sufficient to establish the guilt of the accused." *State v. Nickles*, 728 P.2d 123, 126 (Utah 1986). And "[f]raud may be proved by circumstantial evidence. Indeed, from its nature it is difficult to prove by direct evidence, and it is seldom that it can be so proved. Hence it is more often shown by circumstances than in any other way." *Austin v. Wilkerson, Inc.*, 519 P.2d 899, 904 (Okla. 1974) (citation and internal quotation marks omitted). "However, jury verdicts decided on the basis of 'remote or speculative possibilities of guilt' are invalid." *Salt Lake City v. Carrera*, 2015 UT 73, ¶ 11, 358 P.3d 1067 (quoting *State v.*

*Workman*, 852 P.2d 981, 985 (Utah 1993)). We do not agree with Hawkins that the jury's finding that he devised as well as executed this fraudulent scheme rested on remote or speculative possibilities of guilt.

¶43     Here, the trial evidence showed that Hawkins devised a scheme to entice the victim to buy property based on a promise that Empire Homes would take care of everything. In furtherance of that scheme, Hawkins affirmatively represented that "utilities were not a problem," despite the fact that DPC had not completed the infrastructure necessary for utilities and that completion of the utility infrastructure hinged on Empire Homes' closing on a certain number of lots in a certain amount of time. Hawkins also represented to DPC that funding would not present an issue—and the victim had the same understanding—because Hawkins had access to millions of dollars held in a private trust. Hawkins represented to the victim's brother-in-law that Empire Homes had an insurance policy that would cover any loss should the home they built sell for less than promised. And to ensure the victim signed the real estate purchase contracts with due haste, Hawkins affirmatively represented that the developer would treat the victim and his family to a cruise when in fact the cruise was paid for by money supplied by the victim. Finally, after the victim had already purchased one of the lots, Empire Homes had the victim sign a risk disclosure statement that effectively repudiated every promise Hawkins and Chapple had made. And not only did Hawkins take credit for the risk disclosure statement's creation, he testified that it "brought [him] great solace" when the victim signed it.

¶44     All of this evidence supports the jury's verdict that Hawkins "communicate[d] directly or indirectly with any person by any means for the purpose of executing . . . the scheme" to defraud. *See* Utah Code Ann. § 76-10-1801(1) (LexisNexis 2008). The question though, is whether this evidence constitutes sufficient evidence to establish that Hawkins "devised" the scheme to defraud. Viewing the evidence and the

reasonable inferences drawn from it in the light most favorable to the jury's verdict, as we must, we conclude that it does. *See Montoya*, 2004 UT 5, ¶ 29.

¶45　From the evidence, the jury could reasonably conclude that Hawkins knew that no private trust existed to fund the Deer Canyon Development but that he nevertheless affirmatively represented the existence of such a trust; that Hawkins knew that utilities presented a problem, but affirmatively represented they did not; that Hawkins knew that the developer would not pay for a Disney cruise, but represented that it would; that Hawkins knew that no insurance policy guaranteed the sale price of the homes; and that Hawkins knew the falsity of everything he promised, but promised it all anyway and then conceived a risk disclosure statement repudiating his promises in an effort to shield himself from liability. Moreover, from evidence of Hawkins's role in every stage of the scheme, the jury could reasonably conclude that he not only acted to execute someone else's scheme, but that he also had a hand in devising it.

¶46　Notwithstanding all of the evidence presented to the jury, Hawkins maintains it does not support his conviction, because the victim "received everything he bargained for." However, our review of the record indicates that the victim testified that he did not receive what he bargained for, and for that he blamed Hawkins:

> [Hawkins's Counsel:] So yes or no, do you blame [Hawkins]?
>
> [Victim:] Yes.
>
> [Hawkins's Counsel:] Did you get anything that you didn't bargain for?
>
> [Victim:] I didn't get the end result that was guaranteed.
>
> . . . .

> [Hawkins's Counsel:] So your testimony today is the only thing that you didn't receive is a guarantee.
>
> [Victim:] I didn't receive the promise or the guarantee of what was to take place, yes.
>
> [Hawkins's Counsel]: And that was the guarantee that was going to come from building the home and then splitting the profits?
>
> [Victim:] Yes.

¶47    In spite of this exchange, Hawkins argues that the "alleged 'guarantee' was inconsistent with the [real estate purchase] agreements and the [risk disclosure statement]." But Hawkins fails to support this argument with citations to any legal authority. Accordingly, with respect to this argument, Hawkins has failed to carry his burden of persuasion on appeal. *See State v. Alzaga*, 2015 UT App 133, ¶ 42, 352 P.3d 107 (citing *State v. Thomas*, 961 P.2d 299, 305 (Utah 1998)).

¶48    The present case bears some resemblance to *State v. Smith*, 2003 UT App 425U. There, the defendant "argue[d] that the evidence was insufficient to establish that he devised the fraudulent scheme and communicated it to the victim." *Id*. para. 4. However, the jury heard evidence that he "had knowledge of the investment scheme"; "directly told the victim that he was running the investment"; "told the victim that the investment was 'a sure thing'"; directed that $50,000 of the victim's investment be deposited into the defendant's personal bank account without telling the victim; and "spoke with the victim five or six times by telephone concerning payment on the victim's investment." *Id*. We affirmed the conviction against a sufficiency challenge. *Id.* para. 6.

¶49    Similarly, after reviewing the evidence presented against Hawkins, "'we are not convinced that it is so lacking as to make the [jury's] verdict plainly unreasonable and unjust.'" *Id*. para. 5

(alteration in original) (quoting *State v. Stringham*, 2001 UT App 13, ¶ 30, 17 P.3d 1153).

¶50    In sum, we conclude that any error in binding Hawkins over was cured by the jury's having found him guilty beyond a reasonable doubt. In addition, any error the trial court may have made in interpreting the meaning of the term *devise* under the communications fraud statute was harmless, because the jury was properly instructed on the meaning of that term. Finally, we hold that sufficient evidence exists to sustain Hawkins's conviction.

## II. Material Omissions

¶51    Hawkins next contends that the trial court erred in refusing to instruct the jury that to convict on the basis of a material omission it first had to find that Hawkins had a duty to disclose. The State responds that the trial court "properly refused to add a 'duty to disclose' element to the statutory elements of communications fraud" and that "[e]ven if the trial court erred" "there is no reasonable likelihood the jury would have acquitted" Hawkins had it received a proper instruction. We agree that Hawkins has not shown that any error in the jury instruction resulted in prejudice.

¶52    "Claims of erroneous jury instructions present questions of law that we review for correctness." *State v. Jeffs*, 2010 UT 49, ¶ 16, 243 P.3d 1250. However, to "reverse a trial verdict, [we] must find not a mere possibility, but a reasonable likelihood that the error affected the result." *Id.* ¶ 37 (alteration in original) (citations and internal quotation marks omitted). So, for example, "[w]here the evidence overwhelmingly supports a conviction under one variation of a crime submitted to the jury, we need not reverse a conviction even if there were erroneous instructions on another variation." *State v. Fisher*, 680 P.2d 35, 37 (Utah 1984).

¶53    It is not clear that the court committed error by refusing to instruct the jury on a duty to disclose.[6] But we need not determine that issue here, "because even assuming that it was error not to instruct on [a duty to disclose], we find that the failure to give the instruction was harmless." *See State v. Allen*, 839 P.2d 291, 302 (Utah 1992).

¶54    A person commits communications fraud if the person devises a scheme to defraud "by means of false or fraudulent pretenses, representations, promises, or material omissions" and communicates with another to execute the scheme. Utah Code Ann. § 76-10-1801(1) (LexisNexis 2008). Accordingly, multiple means exist by which a jury may convict a defendant of communications fraud. Here, no special verdict form required the jury to indicate whether they relied on representations or material omissions to convict Hawkins.[7] However, we have already concluded that sufficient evidence of affirmative acts—not mere omissions—supports Hawkins's conviction. *Supra* ¶¶ 43–50. The question before us, then, is whether, in light of this evidence, Hawkins can show a reasonable likelihood that the absence of a duty-to-disclose instruction affected the outcome of his trial.

---

6. We are aware of no Utah case holding that the communications fraud statute requires an instruction on the duty to disclose.

7. This omission alone might prove fatal to a sufficiency claim, because "a defendant who has made 'no request for an instruction which would enable him to know which theory the jury adopted' cannot complain of insufficiency of the evidence for one theory of [the crime] when there was ample evidence under [another] theory." *State v. Fisher*, 680 P.2d 35, 37–38 (Utah 1984) (quoting *State v. Anderson*, 495 P.2d 804, 805 (Utah 1972)).

¶55 Hawkins argues that "this case was about mere omissions and [he] was convicted based on mere omissions." In support of this argument, he asserts that "the State fails to cite to a single false representation that [he] made to [the victim]." But as set forth above, the State in fact relied on numerous false representations made by Hawkins. Hawkins distinguishes many of the false representations on the ground that he made those representations to the victim's brother-in-law and others, but not to the victim. But the communications fraud statute does not require that the accused make the false representations directly to the victim. It requires only that the person communicate, *directly or indirectly*, to any person for the purpose of executing a scheme to defraud:

> Any person who has devised any scheme . . . to defraud another . . . by means of false or fraudulent pretenses, representations, promises, or material omissions, and *who communicates directly or indirectly with any person* by any means for the purpose of executing or concealing the scheme . . . is guilty . . . .

Utah Code Ann. § 76-10-1801(1) (emphasis added). Thus, the question is not, as Hawkins contends, whether he made false representations to the victim, but whether he made false representations to any person either "directly or indirectly." *Id.*

¶56 The record demonstrates that Hawkins made many false representations to the victim indirectly through the victim's brother-in-law and others. For example, the brother-in-law explained that he had asked Hawkins about utilities as part of his due diligence as the victim's consultant. Thus, the jury could reasonably infer that the brother-in-law, as the victim's real estate consultant, would communicate Hawkins's misrepresentation to the victim. Indeed, the brother-in-law participated in the transaction solely to assist the victim with the deal. In addition, the victim testified that he "was always told"

the money would come from "a family trust," that "a family trust was going to come in and buy the whole lot, [and] supply the money for the entire project." Although the victim did not specify who told him about the family trust, Hawkins did directly communicate to DPC's principal that a trust would come in and fund the whole project. Thus, the jury could reasonably conclude that the victim learned about the family trust either directly or indirectly through a communication from Hawkins.

¶57    In contrast to this evidence of affirmative misrepresentations, Hawkins has identified no material omission that the jury might have relied on to convict him. Although he repeatedly asserts that the jury convicted him on the basis of "mere omissions," that he "'said nothing' he was just there," the evidence marshaled above refutes that assertion.

¶58    In sum, even if the trial court erred in refusing to read an implied duty to disclose into the communications fraud statute and in refusing to so instruct the jury—an issue on which we express no opinion—Hawkins cannot show a reasonable likelihood of a different result had the additional instruction been given.

### III. Fair Trial

¶59    Hawkins next contends that he "was denied his right to a fair trial." Hawkins relies nominally on the Due Process and Equal Protection Clauses of the United States Constitution, but he provides no reasoned analysis of either clause or of how they apply to this case. Rather, Hawkins points to four errors he contends should undermine our confidence that he received a fair trial.

¶60    To the extent Hawkins's claim rests on the Due Process and Equal Protection Clauses of the United States Constitution, it is inadequately briefed. "[T]o be adequate, briefs must provide meaningful legal analysis. An adequate brief is one that fully

identifies and analyzes the issues with citation to relevant legal authority. Mere bald citation to authority, devoid of any analysis, is not adequate. And we may refuse, sua sponte, to consider inadequately briefed issues." *State v. Lee*, 2006 UT 5, ¶ 22, 128 P.3d 1179 (citations and internal quotation marks omitted); *see also* Utah R. App. P. 24(a)(9). Under this standard, Hawkins inadequately briefed this claim. Accordingly, he fails to carry his burden of persuasion on appeal. *See* Utah R. App. P. 24(a)(9); *see also Lee*, 2006 UT 5, ¶ 22; *State v. Alzaga*, 2015 UT App 133, ¶ 43, 352 P.3d 107.

¶61 As to his other four claims of error, Hawkins first asserts that "an expert witness . . . withheld testimony at the instruction of the prosecution." In support of his assertion, Hawkins relies solely on extra-record evidence attached as an addendum to his brief. The State moved this court to strike Hawkins's extra-record material. We granted that motion. "[A]n appellant's addendum may not consist of evidence that is outside the record on appeal." *State v. Pliego*, 1999 UT 8, ¶ 7, 974 P.2d 279. "An appellate court's review is . . . limited to the evidence contained in the record on appeal." *Id.* (omission in original) (citation and internal quotation marks omitted). Because "we will not consider evidence which is not part of the record," *id.*, we decline to consider Hawkins's first asserted error.

¶62 Second, Hawkins asserts that another of the State's expert witnesses "testified impermissibly concerning assumptions about evidence that were not properly before the jury." Hawkins challenges the witness's testimony on the ground that the witness "materially misrepresented the facts of the case." The State asks that we decline to consider Hawkins's argument as inadequately briefed. Hawkins counters in his reply brief that he "recites the relevant facts, includes record citations, and applies the relevant law. That is all that is required." We agree with the State.

¶63 Rule 24(a)(9) of the Utah Rules of Appellate Procedure mandates that a party's brief "shall contain the contentions and

reasons of the appellant with respect to the issues presented . . . with citations to the authorities, statutes, and *parts of the record relied on*." Utah R. App. P. 24(a)(9) (emphasis added). Hawkins challenges the testimony of a particular expert witness but his supporting citations to the record refer to a transcript from a day on which the witness did not testify. The appellant bears the burden of identifying the parts of the record that he claims demonstrate trial court error. We will not undertake that burden on his behalf. Accordingly, Hawkins has failed to carry his burden of persuasion on appeal, and we decline to consider his second asserted error. *See Alzaga*, 2015 UT App 133, ¶ 42.[8]

¶64 Third, Hawkins asserts that after his "direct examination, and prior to his cross-examination, the State's prosecutor approached [him] and his counsel and stated 'I will prosecute [Hawkins] for perjury after this is over.'" Hawkins argues that "[s]uch threats amount to misconduct and justify reversal." He cites one case from Iowa and one case from the D.C. Circuit as authority for his argument. We decline to consider this claim on the ground that it is inadequately briefed. The inadequacy lies not in the quantity or the quality of the cited authority, but in the failure to analyze and apply that authority. "[A] party's brief must contain meaningful legal analysis. Specifically, [a] brief must go beyond providing conclusory statements and fully identify, analyze, and cite its legal arguments. Meaningful analysis requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority." *Hess v. Canberra Dev. Co.*, 2011 UT 22, ¶ 25, 254

---

8. Furthermore, the trial court appears to have given a curative instruction on this point, at defense counsel's request and with defense counsel's assistance. On appeal, Hawkins makes no attempt to demonstrate why this instruction did not cure any alleged error. *See State v. Harmon*, 956 P.2d 262, 271–73 (Utah 1998).

P.3d 161 (second alteration in original) (citation and internal quotation marks omitted).

¶65    Here, Hawkins fails to develop the authority on which he relies. Rather, he makes the conclusory statement that when a prosecutor threatens a witness with perjury, that "amount[s] to misconduct and justif[ies] reversal." Hawkins provides no rule of law against which we can judge the prosecutor's alleged misconduct in this case.[9]

¶66    Fourth and finally, Hawkins asserts that his "right to a fair trial was denied when the trial court refused to permit him to present his theory of the case to the jury in the jury instructions." Hawkins devotes one sentence to this contention. We assume that Hawkins means to incorporate his argument that the trial court erred in refusing to instruct the jury that it had to find a duty to disclose before it could convict Hawkins on the basis of a material omission. We have already concluded that any error the trial court may have committed with respect to the jury instructions was harmless. *Supra* ¶ 58. We reiterate that conclusion here.

¶67    Having considered the errors Hawkins has identified, we conclude that none of these errors, alone or in combination, are sufficient to undermine our confidence in the "essential fairness of the trial." *See State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993).

_____

9. The Iowa case on which Hawkins relies, *State v. Peterson*, 532 N.W.2d 813 (Iowa Ct. App. 1995), does provide a rule: "For there to be a denial of due process due to prosecutorial misconduct, there must be a showing that (1) the prosecutorial misconduct kept the witness from testifying (intimidation); and (2) the defendant was prejudiced as a result." *Id.* at 816. Hawkins did testify here.

IV. Right to a Speedy Trial

¶68    Hawkins next contends that he "was denied his rights to a speedy trial." We review the issue of whether a defendant was deprived of his right to a speedy trial for correctness. *State v. Younge*, 2013 UT 71, ¶ 10, 321 P.3d 1127.

¶69    Hawkins nominally relies on the Utah Constitution in support of his right to a speedy trial. However, Hawkins does not develop any authority based on Utah's constitution. Rather, he relies exclusively on authority based on the right to a speedy trial guaranteed by the Sixth Amendment to the United States Constitution. Consequently, to the extent this claim asserts a violation of the Utah Constitution, it is inadequately briefed and we decline to consider it. *See State v. Worwood*, 2007 UT 47, ¶ 19, 164 P.3d 397 (declining to address a state constitutional claim as inadequately briefed when the appellant did not "attempt[] any separate state constitutional analysis"); *State v. Hoffman*, 2013 UT App 290, ¶¶ 54–57, 318 P.3d 225. We do, however, address Hawkins's claim that the trial court violated his speedy trial rights under the Sixth Amendment.

¶70    The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. "The right to a speedy trial is fundamental and is imposed by the Due Process Clause of the Fourteenth Amendment on the States." *Younge*, 2013 UT 71, ¶ 16 (quoting *Barker v. Wingo*, 407 U.S. 514, 515 (1972)). In analyzing whether a defendant has been deprived of his right to a speedy trial, we consider four factors: "[1] Length of the delay, [2] the reason for the delay, [3] the defendant's assertion of his right, and [4] the prejudice to the defendant." *Barker*, 407 U.S. at 530; *see also State v. Knill*, 656 P.2d 1026, 1029 (Utah 1982) (adopting *Barker*'s four-part balancing test).

¶71    "The length of the delay is to some extent a triggering mechanism. Until there is some delay which is presumptively

prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530. In addition, the Utah Supreme Court has refused "to evaluate a speedy trial claim when the right has been affirmatively waived." *State v. Woodland*, 945 P.2d 665, 670 (Utah 1997). Similarly, our supreme court has held "that when a [defendant] acts to delay trial, he indicates his willingness to temporarily waive his right to a speedy trial." *State v. Ossana*, 739 P.2d 628, 631 (Utah 1987) (citing *State v. Velasquez*, 641 P.2d 115, 116 (Utah 1982)).

¶72    Here, the record shows that, from the time of Hawkins's arrest in September 2009 until December 2010, he expressly waived his right to a speedy trial three times—October 2009, March 2010, and December 2010.

¶73    Approximately 18 months elapsed between the date of Hawkins's last waiver in December 2010 and the date on which Hawkins first asserted his right to a speedy trial in May 2012.[10] During those 18 months, Hawkins moved to continue the pre-trial conference (January 2011); he also filed a notice of appearance and substitution of trial counsel (March 2011), two motions to modify conditions of pretrial release (June and July 2011), a motion for authorization to travel (July 2011), and a motion to quash bindover (October 2011). Then, on May 23, 2012, the State moved to continue trial because a material witness had suffered complications from surgery and could not travel from California to testify. Hawkins objected, asserting his right to a speedy trial. The court granted the State's motion and set a June scheduling conference. At that scheduling conference the court set a pretrial conference for December 3, 2012 and a five-day jury trial to begin January 11, 2013. On December 14, 2012, Hawkins moved to dismiss for lack of a speedy trial.

---

10. Hawkins does not challenge the trial court's finding that he first asserted his right to a speedy trial in May 2012.

¶74    Hawkins asserts that "the length of delay [in this case] was approximately 40 months, satisfying the first *Barker* factor." Although Hawkins does not explain how he calculated the alleged 40-month delay, 40 months did elapse between his arrest in September 2009 and his trial in January 2013. But under controlling law not all of this period figures into the speedy trial calculation.

¶75    In particular, we cannot ignore Hawkins's waivers. As explained above, Hawkins expressly waived his right to a speedy trial for the period between October 2009 and December 2010. And during the 18 months between the time Hawkins last waived his right to a speedy trial and first asserted the same right, Hawkins appears to have at least acquiesced, and at most contributed, to the 18-month delay. In fact, in his reply brief Hawkins concedes that "both sides contributed to delays." To the extent that Hawkins caused the delay during this 18-month window, we conclude that Hawkins effectively waived his right to a speedy trial, at least until he first asserted his right in May 2012. *See Ossana*, 739 P.2d at 631.

¶76    Accordingly, we conclude that in calculating the length of the delay, the relevant period begins when Hawkins first asserted his right to a speedy trial in May 2012, at which time the state had moved for a continuance based on the unavailability of a material witness, and ends the first day of trial in January 2013. Thus, the length of the relevant period is seven months. Hawkins concedes as much in his reply brief stating, "there is no dispute that prior to the 7-month continuance, both sides contributed to delays. The real issue before the [court of appeals] is the trial court's handling of the State's motion to continue at the eleventh hour."

¶77    We reiterate that, "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Barker v. Wingo*, 407 U.S. 514, 530 (1972). Hawkins concedes the relevant delay in this case consists of seven months. That period is not obviously

prejudicial and he points to no authority to show that a delay of this duration "is presumptively prejudicial." *See id.* Thus, we see no need to inquire into the other *Barker* factors. *See id.* Accordingly, we hold that the delay in this case did not deprive Hawkins of his right to a speedy trial.

## V. Indigency Motion

¶78    Finally, Hawkins contends that the trial court erred in denying his motion for a determination of indigency and appointment of counsel. In his motion, filed on the first day of trial, Hawkins asked the trial court to find him indigent and to appoint his current privately retained counsel as his indigent defender. A trial court's indigency determination presents a mixed question of fact and law. *See State v. Vincent*, 883 P.2d 278, 282 (Utah 1994). We review the trial court's findings of fact for clear error, and its application of law for correctness. *See id.*

¶79    Utah's Indigent Defense Act (the IDA) governs the provision of counsel to indigent defendants. Utah Code Ann. §§ 77-32-101 to -704 (LexisNexis 2012). Under the IDA "[a] determination of indigency . . . of any defendant may be made by the court at any stage of the proceedings." *Id.* § 77-32-202(1). However, "[i]f a county or municipality has contracted or otherwise provided for a defense services provider, the court may not appoint a noncontracting attorney" unless, among other things, the court finds "a compelling reason to authorize or designate a noncontracting attorney . . . ." *Id.* § 77-32-303(1). This case was tried in Salt Lake County, which contracts with the Salt Lake Legal Defender Association (LDA). Consequently, the court could appoint Hawkins's private, noncontracting counsel as Hawkins's indigent counsel only if it found a compelling reason to do so. *See id.*

¶80    In his motion for determination of indigency and appointment of counsel, Hawkins claimed that he qualified as indigent because he "has no means to pay his attorneys and has failed to do so since May of 2012." Thus, Hawkins requested that

his current and private counsel "be appointed to represent [him] as an indigent defendant."

¶81 In support of his motion, Hawkins claimed that compelling reasons justified the appointment of his privately retained counsel as his indigent defender. Hawkins argued that because the case involved "more than one defendant . . . whose interests are adverse," LDA "is conflicted from representing [him]." He also argued that "[m]ore importantly," because "trial in this matter, including jury selection, is scheduled to begin at 1:00 p.m. on Friday, January 11, 2013 . . . any attorney contracted by [LDA] would be unable to prepare a defense in this matter given the time constraints involved." Hawkins concluded his motion by stating that his current counsel "does not desire to withdraw if the relief requested herein is denied and plans to continue with trial as scheduled." The trial court found that these facts did not constitute a "compelling reason" to appoint a noncontracting defense attorney. We agree.

¶82 First, the trial court rejected Hawkins's argument that an LDA attorney could not represent him due to a conflict of interest. The court explained that LDA's contract with Salt Lake County contains a provision "for non-LDA 'conflict' contract counsel to represent clients when a conflict of interest with LDA exists." Accordingly, Hawkins could have been appointed non-LDA conflict counsel. The trial court did not err in rejecting Hawkins's conflict argument as non-compelling. Hawkins does not challenge this aspect of the court's ruling on appeal.

¶83 Second, the trial court rejected Hawkins's argument that, given the trial's start date, an LDA attorney would not have time to prepare a defense. The trial court properly rejected this argument as a manufactured crisis. While the IDA allows a defendant to file a motion of indigency at any time during the proceedings, Utah Code Ann. § 77-32-202, a defendant cannot withhold his motion until the first day of trial and claim a compelling reason exists to appoint private counsel because, in Hawkins's words, "any attorney contracted by [LDA] would be

unable to prepare a defense in this matter given the time constraints involved."

¶84  Hawkins claims that he should not have had to delay his trial to allow an LDA attorney time to come up to speed; that he should not have had to choose between his right to a speedy trial and his rights under the IDA. But Hawkins offers no reason why he could not have moved the court to appoint counsel much earlier than he did. For example, Hawkins's claim of indigency rested in part on the fact that he had not paid his retained attorney since May 2012, seven months before trial. Further, Hawkins asserted that although he had not paid counsel since May 2012, he became indigent in September 2012, four months before trial. He also maintains that he started incurring significant legal fees beginning in November 2012, two months before trial. Yet he waited until the first day of trial to file his motion to appoint his retained counsel to represent him. In light of these facts, we agree with the trial court that "it appears . . . that Mr. Hawkins filed [his indigency motion] not with any actual desire to obtain a public defender, but rather to find a way to have his private attorney paid" with taxpayer dollars.

¶85  We therefore affirm the trial court's denial of Hawkins's motion for indigency.


CONCLUSION

¶86  For the foregoing reasons, Hawkins's conviction is affirmed.

_____